**Opinion issued January 23, 2014**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00011-CV

———————————

**EDWARD NWOKEDI & 1002 GEMINI INTERESTS, LLC, Appellants**

**V.**

**UNLIMITED RESTORATION SPECIALISTS, INC., Appellee**

---

**On Appeal from the 113th Judicial District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-09890**

---

## O P I N I O N

Appellants Edward Nwokedi and 1002 Gemini Interests, LLC appeal a judgment entered against them in favor of appellee Unlimited Restoration Specialists, Inc., trading as Unlimited Restoration, Inc. (URI), a company that provided restoration services to Gemini's property after it was damaged during

Hurricane Ike. After Gemini refused to pay URI for its services, URI sued Nwokedi and Gemini for fraud, breach of contract, quantum meruit, theft of services, promissory estoppel, and fraudulent transfer. A jury found in favor of URI on all theories, and the trial court entered judgment awarding URI compensatory and exemplary damages and attorney's fees. The judgment also voided four fraudulent transfers by Nwokedi and Gemini, imposed a constructive trust on fraudulently transferred insurance proceeds, and enjoined Nwokedi and Gemini from transferring any assets that are or could be subject to execution.

In nine issues, Nwokedi and Gemini contend that the judgment should be reversed. We modify the trial court's judgment to reduce the amount of fraudulently transferred funds to which the constructive trust applies and affirm the judgment of the trial court as modified.

## Background

Gemini, a limited liability company in which Nwokedi owns a controlling interest, owned a commercial property in Clear Lake that was damaged in September 2008 during Hurricane Ike. The property was managed by Boxer Property Management Corporation and was insured by Travelers Lloyd's Insurance Company. On September 19, 2008, Boxer's director of operations contacted URI about repairing the damage. At Boxer's request, two URI representatives, a Boxer representative, and Russell Joseph, a Travelers adjuster,

2

inspected the damage. URI informed Boxer that one-third of the building's roof had been compromised and 35 percent of the building had been affected by major water intrusions. Based on the inspection, URI recommended shrink-wrapping the roof, extracting excess water, drying the structure, removing the wet carpet, demolishing certain ceiling tiles and sheetrock, and treating the walls, floors, and ceiling with an antimicrobial solution. For this work, URI proposed an estimated budget of $220,000.

The next day, URI met with Boxer's representatives to discuss a contract for restoration services between URI and Gemini. URI usually billed its clients on a time-and-materials basis and required payment by the client directly to URI. In this case, however, URI agreed, at Boxer's request, to a modification of URI's standard payment terms: Gemini would "pay up to their deductible amount, [but] for any amount above [Gemini's] deductible [Gemini] agrees to endorse all Travelers payment[s] made to URI and [Gemini] over to URI." The parties' handwritten notation on the contract stated that Travelers would disburse insurance proceeds paid on the claim by two-party checks, made out to both Gemini and URI.

The parties signed the contract on September 20 and agreed to the first work order. It provided that URI would complete "roof repair and remediation work per the attached URI contract" and that the cost for that work was not to exceed

3

$220,000. The contract's initial scope of services included: restorative dry out; selective demolition and debris removal; removal of contents, storage, cleaning, and deodorizing; provision of temporary power and temperature control; and general cleaning. It is undisputed that URI's initial scope of work did not include any mold remediation. Travelers' adjuster approved the proposed first work order in an email in which he noted, consistent with the contract between URI and Gemini, that "any amount above the deductible up to the budget of $220,000 will be paid as a joint check to URI and [Gemini] as you requested."

URI began the work on September 21 and soon discovered that there was more wet material that needed to be removed than initially anticipated. On September 26, Travelers' adjuster approved the removal of vinyl wallpaper due to moisture. The following day, the adjuster informed Nwokedi by email that further inspection revealed additional wet and compromised drywall that needed to be removed. The adjuster also noted that he saw significant mold or fungal growth in some areas and recommended that Nwokedi contact a certified industrial hygienist to evaluate the situation. URI's project manager had also seen the mold, and recommended that Gemini contact a certified industrial hygienist.

In a letter dated October 2, URI informed Boxer that it would exceed the initial estimated budget of $220,000 by approximately $110,000 "due to additional necessary demolition of wet material." The next day, Travelers' adjuster informed

4

URI, Boxer, and Nwokedi that Travelers had approved the additional demolition, stating "[t]he budget is approved subject to normal review of supporting documentation with URI. We would like to see a budget on the direct damage from mold. We will tender our limit on mold providing it exceeds the $15,000 limit in the policy." That same day, Boxer generated a second work order for the "additional remediation work approved by Russ Joseph of Travelers e-mail attached 10/03/08." URI's project manager signed this second work order 12 days later, on October 15.

Meanwhile, Boxer hired Astex Environmental Services to evaluate whether mold remediation work was required. Astex prepared a Mold Remediation Protocol detailing the steps URI would take to remediate the mold, and gave it to URI on October 1, 2008.

URI performed the work outlined in the Astex protocol between October 2 and October 24, at which point Gemini released URI from the property. Four days later, URI submitted its invoice totaling $619,010.18 to Boxer, who forwarded the invoice to Gemini's independent claims consultant. On November 7, Gemini's claims consultant submitted the invoice to Joseph and requested that Travelers "submit payment to the insured at your earliest convenience."

On November 13, Boxer requested that Gemini pay Boxer's management fee. The management agreement between Boxer and Gemini provided that

5

Boxer's fee would be a percentage of the total cost of URI's services, $619,010.18. Nwokedi's email response warned: "Be very careful with this information. We are still working through the settlement with Travelers and they expect URI to be doing the repairs. Let's not discuss details of our plans with [Joseph]." Boxer responded: "Understood."

At Travelers' request, URI revised the amount of its original invoice downward by $20,390.27 and submitted a new invoice in the amount of $598,619.91. It also submitted new invoices for debris removal in the amount of $24,522.62, bringing the amount of all URI's submitted invoices to $623,142.53. Gemini's claims consultant emailed URI and Nwokedi, expressing irritation at Travelers' requested changes and instructing URI to resist reducing the value of Gemini's claim and apply normal invoicing and pricing standards. He wrote:

> [Joseph] is simply trying to beat down the price of [the] claim. May I suggest you apply your normal invoicing & pricing standards. If he wants to discuss price changes send him to me to discuss price changes. He is communicating with everyone but me & the insured on the final value for the claim looking for ways to decrease the value, which I think is completely unethical. The insured has a replacement cost policy how he elects to put his building back together is his decision as defined in his policy, not the price [Joseph] thinks it should be.
>
> Thanks for cooperating with him, but for pricing changes, send him to us.

In December 2008, Travelers issued two checks totaling $996,881.71 to Gemini. Despite Gemini's agreement with URI, Nwokedi instructed Travelers not

6

to put URI's name on the checks. Gemini did not endorse the checks to URI, did not pay URI's invoices, and did not inform URI that it would not do so. Instead, Nwokedi deposited these two checks into Gemini's bank account ending in 2056. After making several payments to contractors other than URI, Nwokedi closed the 2056 account and deposited the remaining insurance proceeds, $714,428.58, in another Gemini bank account ending in 0589.

In January 2009, URI sent Gemini a letter demanding payment of its outstanding invoices which totaled $623,142.53. Gemini's claims consultant responded that Gemini was waiting for Travelers to settle the claim and that Nwokedi would contact URI to resolve URI's claim after Gemini settled with Travelers. The following day, Nwokedi emailed URI to say that Gemini would pay its deductible, $88,935, which it eventually did pay.

On February 18, 2009, URI sued Gemini for the unpaid balance of $534,207.53. Gemini and Nwokedi defended on the theory that the work done pursuant to the Astex protocol was within the scope of the second work order and therefore subject to the $110,000 cap. URI disagreed, and asserted that the Astex protocol covered a separate and distinct scope of work, for which Gemini represented that URI would be paid on a time-and-materials basis in accordance with the rate schedule attached to the services contract.

7

While the suit was pending, Nwokedi made a series of transfers from Gemini's account number 0589 to other various accounts. URI amended its petition to add a claim under the Uniform Fraudulent Transfer Act, alleging that Nwokedi transferred these assets with the intent to hinder, delay, and defraud URI.

After a two week jury trial, the jury found for URI on all claims and awarded compensatory damages, punitive damages, and attorney's fees. The trial court entered judgment in URI's favor, which, among other things, enjoined Nwokedi and Gemini from "disposing of, or transferring title to, any assets or properties that are or could be subject to execution under this Judgment."

Two months after judgment was entered, URI filed an Emergency Motion for Contempt and Request for Show Cause Hearing and an Application to Appoint a Receiver. Following an evidentiary hearing, the trial court found that Nwokedi transferred non-exempt assets, including $500,175.40 in cash, in violation of the final judgment. The trial court sanctioned Nwokedi, fined him $3,000, and ordered him to pay URI's attorney's fees and costs associated with the motion. The trial court also appointed a receiver over Nwokedi's nonexempt assets and property interests.

Gemini and Nwokedi appealed, challenging: (1) the sufficiency of the evidence to support several jury findings; (2) the imposition of a constructive trust; and (3) the post-judgment sanctions. They argue the case should be reversed and

remanded with instructions for the trial court to award attorney's fees in their favor.

**Sufficiency of the Evidence**

In their first point of error, Nwokedi and Gemini argue that there is legally and factually insufficient evidence of fraud because: (1) the only evidence of intent to induce action is circumstantial evidence occurring after contract formation; and (2) there is insufficient evidence that Nwokedi or any agent of Gemini made any misrepresentations or withheld any material information from URI.

**A.    Standard of Review**

In a legal sufficiency, or no-evidence review, we determine whether the evidence would enable reasonable and fair-minded people to reach the verdict under review. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In conducting this review, we credit favorable evidence if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We consider the evidence in the light most favorable to the finding and indulge every reasonable inference that would support it. *Id.* at 822. "If there is any evidence of probative force to support the finding, i.e., more than a mere scintilla, we will overrule the issue." *City of Houston v. Hildebrandt,* 265 S.W.3d 22, 27 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (citing *Haggar Clothing Co. v. Hernandez,* 164 S.W.3d 386, 388 (Tex. 2005)).

9

In reviewing a challenge to the factual sufficiency of the evidence, we consider and weigh all of the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). The factfinder is the sole judge of the credibility of witnesses and it may choose to believe one witness over another. *City of Keller*, 168 S.W.3d at 819. Because it is the factfinder's province to resolve conflicting evidence, we must assume that it resolved all conflicts in accordance with the verdict if reasonable people could do so. *Id.*

## B.    Applicable Law

To establish a common law fraud cause of action, a plaintiff must prove (1) a material representation was made, (2) which was false, (3) which was either known to be false when made or made recklessly as a positive assertion without knowledge of its truth, (4) which the speaker made with intent that it be acted upon, (5) the other party took action in reliance upon the misrepresentation, and (6) thereby suffered injury. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998). A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time the promise was made. *Formosa*, 960 S.W.2d at 48; *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434–35 (Tex. 1986). Evidence must be presented that a representation was made with the intent

10

to deceive, and with no intention of performing as represented, at the time the representation was made. *Formosa*, 960 S.W.2d at 48; *Spoljaric*, 708 S.W.2d at 434. The speaker's intent at the time of the representation may be inferred from the speaker's acts after the representation was made. *Spoljaric*, 708 S.W.2d at 434.

Intent is a fact question within the realm of the trier of fact because it is dependent upon the credibility of witnesses and the weight to be given to their testimony. *Id.* "Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence." *Id.* at 435. Mere failure to perform as promised does not constitute evidence that the party did not intend to perform. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006). However, breach of a promise to perform combined with "slight circumstantial evidence" of fraud constitutes some evidence of fraudulent intent and is legally sufficient to support a verdict. *Id.*; *Spoljaric*, 708 S.W.2d at 435.

## C. Analysis

### 1. Intent

Question 5 of the charge asked, "Did Nwokedi and/or Gemini commit fraud against URI?" URI's theory of liability was that, at the time Nwokedi and Gemini promised to pay URI for the work reflected on the two work orders and the Astex protocol, they did not intend to perform as promised. Instead, Nwokedi and Gemini promised to pay for the work with insurance proceeds received from

11

Travelers, while intending to keep these proceeds for themselves and shortchange URI.

URI adduced evidence of promises made to URI: (1) Gemini agreed that it would pay URI the deductible but that, to the extent the bill exceeded the deductible, URI would be paid with insurance proceeds from Travelers, subject to the caps set forth in the first and second work orders; (2) Gemini agreed that URI would be named as a payee on the checks Travelers made out to Gemini (and initially instructed Travelers to make checks out to both parties); (3) Gemini agreed to endorse Travelers' checks over to URI; and (4) Gemini agreed URI would be paid on a time-and-materials basis for the work completed under the Astex protocol.

URI's evidence also demonstrated that these payment terms were a departure from URI's customary payment terms and were changed at Gemini's urging. A co-owner of URI, Gene Eady, testified that URI took a risk by agreeing to this payment arrangement because it conditioned payment on Travelers' approval of the work performed. He testified that URI relied on Gemini's representations—that URI would be a named payee on the Travelers checks and that Gemini would endorse the checks over to URI—in deciding to agree to this modification and to enter into the contract. Another URI co-owner, Gerald Rogers,

testified that Nwokedi himself represented to Rogers that Travelers would be issuing URI payment for any amount owed above the deductible.

URI also adduced sufficient evidence for a rational trier of fact to find that Gemini and Nwokedi made these promises with the intention not to perform at the time the promises were made. *See Formosa*, 960 S.W.2d at 48; *Tony Gullo Motors*, 212 S.W.3d at 305. For instance, in a December 8, 2008 email exchange, Gemini's claims consultant informed Nwokedi that URI wanted its name on a check issued by Travelers. Nwokedi responded, "I don't want URI's name on my check; it would only complicate things. Besides, this does not fit our objectives." At trial, Nwokedi testified that his objective—to maximize the value of his insurance claim—was legitimate and not sinister. He claimed he was only trying to keep URI's name off the check because he was concerned that Travelers was trying to reduce its value. But the jury could have disregarded his explanation because whether URI was a payee on the Travelers checks is unrelated to the value of the claim. Nwokedi's email supports an inference that his objective was to agree to have URI as a payee on Travelers' checks in order to induce URI to perform the work, while intending to later instruct Travelers not to include URI as a payee in order to keep the insurance proceeds for himself and pay URI less than agreed.

Additionally, in a January 2009 email exchange, Nwokedi told Boxer that Gemini was prepared to settle the claim with URI "in full" but that Nwokedi wanted to keep the "amount of payment silent for now." Nwokedi explained, "We need to conclude the final payment with Travelers this week before we can indicate. URI and Travelers are working together and we wouldn't want to tip them off." Nwokedi concluded, "Hopefully you understand clearly what is happening?" That same month, in response to URI's demand for payment, Gemini's claims consultant responded that Nwokedi would contact URI to resolve the claim after Travelers paid Gemini the full amount on the claim, despite the fact that Gemini had already received $996,881.71—far more than the amount of URI's invoices—in advances from Travelers.

Finally, at no time between October, when Gemini received URI's invoice, and February, when URI sent its follow up to its demand for payment, did Nwokedi or any representative of Gemini inform URI that Gemini did not intend to pay URI the full amount of URI's invoices. If Gemini had said as much to URI before Travelers paid Gemini's claim, URI could have contacted Travelers and insisted upon its contractual right to have Travelers include URI as a payee.

Based on the above evidence, the jury could have rationally concluded that, at the time the promises were made, Nwokedi and Gemini did not intend to pay URI as promised, but instead, intended to delay payments to URI until after

14

Travelers had disbursed all the proceeds on the claim to Gemini, then pay URI substantially less than the amount Gemini agreed to pay and Travelers approved. *See Weinberger v. Longer*, 222 S.W.3d 557, 563–65 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (holding there was legally and factually sufficient evidence of fraud where contractor agreed to remodel home but performed defective work and charged homeowner for materials and labor used on other projects). Additionally, having considered and weighed all the evidence, we conclude the jury's fraud finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See id.*; *Cain*, 709 S.W.2d at 176.

## 2. Individual liability

Nwokedi and Gemini also contend that there is insufficient evidence to support a finding that Nwokedi is individually liable because there is no evidence that he spoke to any URI representative about the contract or engaged in any of the contract negotiations.

A corporate officer who knowingly participates in tortious or fraudulent acts may be held individually liable to third persons even though he performed the act as an agent of the corporation. *Walker v. Anderson*, 232 S.W.3d 899, 918 (Tex. App.—Dallas 2007, no pet.); *Glattly v. CMS Viron Corp.*, 177 S.W.3d 438, 448 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

15

Here, the evidence demonstrates that Nwokedi, who owned a controlling interest in Gemini, knowingly participated in Gemini's fraud. First, despite Gemini and Nwokedi's assertion to the contrary, there is evidence that Nwokedi participated in the contract negotiations with URI. He instructed Boxer, who negotiated the contract with URI on Gemini's behalf, telling him which contract terms to modify. And Nwokedi admitted that he requested the modifications to the standard payment language in URI's contract. Nwokedi also personally reassured representatives of URI that Travelers was acting on Gemini's behalf and that URI would be receiving payments from Travelers. Further, Nwokedi sent several emails instructing Travelers not to issue checks to URI because it did not fit with his "objectives," and directing Gemini's claims consultant and Boxer to keep "silent" about the amount Gemini received from Travelers and the amount Gemini intended to pay URI. This is evidence that Nwokedi knowingly participated in the fraud. Therefore, we conclude there was legally and factually sufficient evidence to hold Nwokedi individually liable for fraud.[1] *See Walker*, 232 S.W.3d at 918; *Glattly*, 177 S.W.3d at 448.

---

[1] Because we have found the evidence was sufficient to hold Nwokedi individually liable for fraud, we need not address Nwokedi and Gemini's third point of error, in which they challenge the sufficiency of the evidence to support the jury's finding in response to Question 9 that Nwokedi was the alter ego of Gemini. *See Walker v. Anderson*, 232 S.W.3d 899, 917–19 (Tex. App.—Dallas 2007, no pet.)(holding plaintiffs were not required to pierce corporate veil in order to hold appellant individually liable where appellant, who was corporate shareholder, committed

We overrule Nwokedi and Gemini's first point of error. Because we have concluded that sufficient evidence of fraud supports the compensatory damages award, we need not address Nwokedi and Gemini's sixth issue in which they challenge the jury's verdict on URI's alternate theories of liability (i.e., breach of contract, quantum meruit, theft of services, and promissory estoppel).

**Exemplary Damages Award**

In their second point of error, Nwokedi and Gemini challenge the exemplary damages awards on the grounds that URI failed to prove fraud. Specifically, they argue there was "absolutely no evidence that at the times the Service Contract and the two work orders were agreed, Gemini had no intent to pay for URI's services; and Nwokedi never made a promise individually." Nwokedi and Gemini do not challenge the exemplary damages awards on any other basis.

As detailed above, URI presented sufficient evidence to support the jury's fraud finding. Accordingly, we reject Nwokedi and Gemini's challenge to the exemplary damages awards. *See Marin v. IESI TX Corp.*, 317 S.W.3d 314, 333–34 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (overruling appellant's challenge to sufficiency of the evidence to support exemplary damages award

tortious act by fraudulently transferring corporate assets); *Commercial Escrow Co. v. Rockport Rebel, Inc.*, 778 S.W.2d 532, 541 (Tex. App.—Corpus Christi 1989, writ denied) (holding that corporate officer may be held personally liable to third parties if he knowingly participates in fraudulent activity, even though he performed acts as agent of corporation, and it is not necessary to pierce corporate veil in order to impose individual liability).

where court found sufficient evidence supporting jury's findings of fraud, forgery, and misapplication of fiduciary duty).

We overrule Nwokedi and Gemini's second point of error.

## Uniform Fraudulent Transfer Act

In their fourth point of error, Nwokedi and Gemini contend there is legally and factually insufficient evidence to support the jury's fraudulent transfer finding. Question 15 asked: "Did either Nwokedi or Gemini fraudulently transfer property with the intent to hinder, delay, or defraud his creditors?"  The jury answered yes as to both Nwokedi and Gemini and found in response to Question 16 that $618,000  would compensate URI for its damages that resulted from Nwokedi or Gemini's fraudulent transfer of assets.  The trial court's judgment voided and set aside the following transfers, which total $618,454:

1) a transfer of $75,000 of Travelers proceeds from 0589 Gemini Insurance Account to an account ending in 2692,

2) a transfer of $175,000 of Travelers proceeds from 0589 Gemini Insurance Account to an offshore  Intercontinental  Bank  escrow account in Lagos, Nigeria,

3) a transfer of $120,930 of Travelers proceeds to Gemini/Nwokedi, and,

4) a transfer of $247,615 of Travelers proceeds from the 0589 Gemini Insurance Account to Nwokedi's personal account, the Nwokedi Business Ventures "NBV" 5052 account.

18

In support of their challenge to the legal and factual sufficiency of the evidence, Nwokedi and Gemini raise four arguments: (1) URI had no trust interest in the Travelers proceeds; (2) there is no evidence that Nwokedi is personally liable for the transfers of Gemini's funds; (3) there is no evidence that any of the assets transferred were Nwokedi's; and (4) URI failed to prove that these transfers were fraudulent or made with the actual intent to hinder, delay or defraud its creditors.[2]

## A.    Applicable Law

The purpose of UFTA is to prevent fraudulent transfers of property by a debtor who intends to defraud creditors by placing assets beyond their reach. *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 607 (Tex. App.—Houston [1st Dist.] 2002, no pet.). The act provides that a transfer of an asset is fraudulent, as to a creditor, if the debtor made the transfer with the actual

---

[2]    Nwokedi and Gemini also argue, in the alternative, that we must limit URI's recovery on its fraudulent transfer claim in accordance with the lowest intermediate balance rule (LIBR). *See Creative Merchandising, Sys., Inc. v. Famous Fixtures*, No. 05-95-01129-CV, 1997 WL 181523, at *2 (Tex. App.—Dallas 1997, writ. denied) (not designated for publication) (LIBR assumes that claimant's funds are the last to be withdrawn from an account, and thus, if the commingled account's balance falls below the claim's value at any point during the relevant time period, the claimant may only recover the lowest intermediate amount that was available in the account); *see also* TEX. BUS. & COM. CODE ANN. § 9.315 cmt. 3 (West 2011) (citing Restatement (Second) of Trusts § 202 (1959)). Nwokedi and Gemini did not raise this argument in the trial court. Accordingly, we hold it was not preserved for our review. *See* TEX. R. APP. P. 33.1(a).

19

intent to hinder, delay, or defraud any of the debtor's creditors. Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ Aɴɴ. § 24.005(a)(1) (West 2009).

Under the UFTA, a "creditor" is defined broadly as any person who has a "claim." *Id.* § 24.002(4) (West 2009). "Claim" is defined as "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured." *Id.* § 24.002(3). "Transfer" is defined in the UFTA as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset . . . and includes payment of money." *Id.* § 24.002(12). An "asset" is the "property" of the debtor, which includes anything that may be the subject of ownership. *Id.* § 24.002(2), (10).

The UFTA identifies several "badges of fraud," which are used to determine whether the debtor made the transfer with the requisite fraudulent intent. *Id.* § 24.005(b)(1)–(11); *Tel. Equip. Network*, 80 S.W.3d at 607. Consideration may be given, among other factors, to whether:

(1)  the transfer or obligation was to an insider;

(2)  the debtor retained possession or control of the property transferred after the transfer;

(3)  the transfer or obligation was concealed;

(4)  before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

20

(5)  the transfer was of substantially all the debtor's assets;

(6)  the debtor absconded;

(7)  the debtor removed or concealed assets;

(8)  the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of obligation incurred;

(9)  the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS. & COM. CODE ANN. § 24.005(b)(1)–(11).

Under section 24.008, the remedy for a fraudulent transfer is the avoidance of the obligation to the extent necessary to satisfy the creditor's claim or an attachment against the asset transferred. *Id.* § 24.008(a)(1)–(2) (West 2009). The creditor may also recover a judgment for the value of the asset transferred or in the amount necessary to satisfy the creditor's claim, whichever is less. *Id.* § 24.009(b) (West 2009); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 27 (Tex. App.—Tyler 2000, pet. denied).

**B.   Analysis**

URI sued Gemini on February 18, 2009. Beginning in June 2009 and continuing until June 2011, Nwokedi initiated a series of transfers, which URI

21

alleges were fraudulent, from the Gemini bank account ending in 2056. In December 2008, Nwokedi had received two checks from Travelers, totaling $996,881.71, as advances on the Hurricane Ike insurance claim for the Gemini property. Nwokedi deposited these two checks into the 2056 account, which had a beginning balance of $0.00. After Nwokedi made several payments to contractors between January 2009 and April 2009, the ending balance in May 2009 in the 2056 account was $714,428.58. Nwokedi then closed the 2056 account and deposited the remaining insurance proceeds, $714,428.58, in a new account, held in Gemini's name, ending in 0589. Nwokedi also deposited another check from Travelers, in the amount of $213,666.91, into the 0589 account, bringing the amount of Travelers-paid proceeds deposited in the 0589 account to $928,095.49. An additional $120,930 issued by Travelers to Gemini was not deposited into any of Gemini's accounts and remains unaccounted for.

Over the course of the next two years, Nwokedi made a number of transfers from the 0589 account. In particular, he transferred:

- $75,000 to an account ending in 2692,
- $175,000 to an offshore account held at the Intercontinental Bank, and
- $755,000 to the 5052 Nwokedi Business Ventures account, of which he expended $507,385.32 to benefit Gemini.

## 1. Trust Interest

Nwokedi and Gemini contend it was error to submit the fraudulent transfer question to the jury because URI had no trust interest or right to receive payment

from the Travelers proceeds and, therefore, had no "claim" under UFTA. Nwokedi and Gemini argue that URI was limited to recovery under a breach of contract theory and, therefore, had no right to recover specific insurance proceeds. Finally, Nwokedi and Gemini argue that the UFTA applies only to transfers of the debtor's general assets, not specific assets like insurance proceeds.

Nwokedi and Gemini's argument that URI was required to show that it had a "trust interest" in the insurance proceeds is an attempt to add an element to a claim for fraudulent transfer under the UFTA. The UFTA requires evidence of the following: (1) that URI is a creditor, i.e., has a claim against; (2) debtors Nwokedi and Gemini; (3) that Nwokedi and Gemini transferred assets after, or a short time before, URI's claim arose; and (4) that those transfers were made with the intent to hinder, delay, or defraud URI. *See* TEX. BUS. & COM. CODE ANN. § 24.005(a)(1). And a tort claimant is entitled to file causes of action under the UFTA based on pending, unliquidated tort claims. *See id.* § 24.002(3), (4); *Redmon v. Griffith*, 202 S.W.3d 225, 241 (Tex. App.—Tyler 2006, pet. denied); *Blackthorne v. Bellush*, 61 S.W.3d 439, 443–44 (Tex. App.—San Antonio 2001, no pet.). Here, URI brought its claim for fraudulent transfer in conjunction with its other claims, which included a tort claim against Nwokedi and Gemini for fraud. We therefore reject Nwokedi and Gemini's argument that URI also had to establish that it had a "trust

23

interest" in the proceeds at the time of the transfers. *See Redmon*, 202 S.W.3d at 241; *Blackthorne*, 61 S.W.3d at 443–44.

Nwokedi and Gemini's argument that the Travelers proceeds are not subject to a fraudulent transfer claim is likewise unpersuasive. The purpose of the UFTA is to prevent transfers by a debtor who intends to defraud creditors by placing assets beyond their reach. *Tel. Equip. Network*, 80 S.W.3d at 607; *see also* TEX. BUS. & COM. CODE ANN. § 24.005(a)(1) ("A transfer made . . . is fraudulent as to a creditor . . . if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor."). Under the UFTA, the proceeds received from Travelers are an asset of Gemini's, and if that asset was transferred with the intent to defraud URI, then that transfer is fraudulent. *See* TEX. BUS. & COM. CODE ANN. § 24.002(2), (10) (under the UFTA, "asset" means property of a debtor and "property" means anything that may be the subject of ownership). For these reasons, we reject Nwokedi and Gemini's claim that the Travelers proceeds could not be subject to a fraudulent transfer claim. *See id.* §§ 24.002(2), (10), 24.005(a)(1).

## 2. Sufficiency of Evidence

Nwokedi and Gemini also contend that legally and factually insufficient evidence supports the jury's fraudulent transfer findings. In conducting a legal sufficiency review, we review the evidence presented below in a light most

24

favorable to the jury's verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010); *City of Keller*, 168 S.W.3d at 827. In conducting a factual sufficiency review, we consider all the evidence and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain*, 709 S.W.2d at 176. Under either standard of review, we must be mindful that the jury as finder of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Raymond v. Rahme*, 78 S.W.3d 552, 556 (Tex. App.—Austin 2002, no pet.).

A transfer made by a debtor is fraudulent as to a creditor if the transfer was made with the actual intent to hinder, delay or defraud the creditor or where the debtor did not receive a reasonably equivalent value in exchange for the transfer. *See* TEX. BUS. & COM. CODE ANN. § 24.005(a)(1)–(2). Direct proof of fraudulent intent is often unavailable. *Mladenka v. Mladenka,* 130 S.W.3d 397, 405 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Therefore, circumstantial evidence may be used to prove fraudulent intent, including evidence of the badges of fraud listed in section 24.005(b). *G.M. Houser, Inc. v. Rodgers*, 204 S.W.3d 836, 842–43 (Tex. App.—Dallas 2006, no pet.).

The judgment set aside four transfers. We will review the relevant evidence with respect to each of them in turn.

*a. $75,000 Transfer from Account 0589 to Account 2696*

Nwokedi and Gemini claim this transfer cannot be fraudulent because Nwokedi testified that the transfer was made for a legitimate business reason, i.e., to provide its property manager, Boxer, operating revenue for the Gemini building.

The evidence showed that, on September 1, 2009, Nwokedi requested that $75,000 be transferred from Gemini's account 0589 to the account ending in 2692. Nwokedi initially testified that he did not recall what he did with the $75,000, and, even when he was shown documentation of the requested transfer, he could not recall in whose name account 2692 was held. He later testified that this transfer was to Boxer's "operating account" at Amegy Bank, and was made in response to a "cash call," for the purpose of providing Boxer with cash to operate and manage the Gemini property.

On cross-examination, Nwokedi testified that Boxer was the custodian of account 2692 and that he was not a signatory and had nothing to do with that account. Finally, he testified that he did not produce bank statements or documents associated with account 2692 because he was not a signatory on that account and could not make Boxer supply its account information.

The documentary evidence, however, belied Nwokedi's testimony. It showed that account 2692 was an account at Encore Bank, not an account at Amegy Bank, as Nwokedi claimed. More importantly, the transfer document reflects that the transfer could not have been executed unless the person requesting it—Nwokedi—was a signatory *on both accounts*.

Considering the badges of fraud in section 24.005(b), we conclude that legally and factually sufficient evidence supports the jury's finding that the $75,000 transfer to account 2692 was a fraudulent transfer. First, the evidence permitted the jury to conclude that the transfer was to Nwokedi, an "insider." *See* TEX. BUS. & COM. CODE ANN. § 24.005(b)(1). If the debtor is a corporation, an "insider" includes, but is not limited to, an officer of the debtor, a person in control of the debtor, or a relative of a general partner, director, officer, or person in control of the debtor. *Id.* § 24.002(7)(B); *see also Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 378 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). Although the evidence does not establish the identity of the accountholder for account 2692, the jury could have found, based on the fact that Nwokedi was a signatory on both accounts, that account 2692 was either held in Nwokedi's name or in the name of an entity he controlled. *See Tel. Equip. Network*, 80 S.W.3d at 609 (evidence suggested transfer of property was to an "insider" where the debtor and transferee shared common ownership and management). This same evidence

27

suggests that Nwokedi, and, thus, Gemini, retained control over the $75,000 after it was transferred to account 2692. *See* TEX. BUS. & COM. CODE ANN. § 24.005(b)(2) (that the debtor retained possession or control of the property transferred after the transfer is a "badge of fraud").

Furthermore, the jury could have concluded, based on Nwokedi's testimony regarding the transfer, that he was attempting to conceal the transfer, or at least the identity of the transferee. *See id.* § 24.005(b)(3). Finally, it is undisputed that the $75,000 transfer was made after URI sued Gemini in February 2009. *See* TEX. BUS. & COM. CODE ANN. § 24.005(b)(4) (that the debtor had been sued or threatened with suit before the transfer was made is a "badge of fraud").

In sum, the record contains evidence of several of the badges of fraud enumerated in section 24.005(b) and is legally sufficient to support the judgment setting aside the $75,000 transfer. *See Mladenka*, 130 S.W.3d at 407; *Tel. Equip. Network*, 80 S.W.3d at 609; *see also Metal Bldg. Components, LP v. Raley*, No. 03-05-00823-CV, 2007 WL 74316, at *7–9 (Tex. App.—Austin Jan. 10, 2007, no pet.) (mem. op.) (affirming finding of fraudulent transfer where, among other things, there was evidence that property was transferred to insider but transferor retained control over property, and transferor had been sued prior to transfer); *Garcia v. Guerrero*, No. 04-09-00002-CV, 2010 WL 183480, at *4 (Tex. App.— San Antonio Jan. 20, 2010, no pet.) (mem. op.) (affirming finding of fraudulent

28

transfer where, among other things, transfer was made to insider, there was evidence from which inference could be made that transferor attempted to conceal transfer, and transferor retained access to property). The evidence is also factually sufficient because, although the defendants adduced evidence to justify the transfer, the judgment setting aside the $75,000 transfer is not so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176.

### b. $175,000 Transfer from Account 0589 to Offshore Account in Nigeria

Nwokedi and Gemini next contend that the $175,000 transfer from Gemini account 0589 to an offshore account in Nigeria on June 16, 2011 was not a fraudulent transfer because the money was deposited in an escrow account for the purchase of an interest in an apartment complex in Nigeria.

Nwokedi testified that he wired the $175,000 from Gemini account 0589 to an escrow account at Intercontinental Bank, which Nwokedi acknowledged is an offshore bank. Nwokedi testified that the money was being held in escrow for the purchase of an apartment complex in Lagos, Nigeria, that he was buying the apartment building because of the "hot" housing market and that, once the deal closed, Gemini would own the investment property. Nwokedi later clarified that the apartment complex would actually be owned by a new entity in which Gemini would hold an interest.

Considering this evidence in light of the badges of fraud, we conclude that there is legally and factually sufficient evidence to support the finding that the $175,000 transfer to the offshore account in Nigeria was fraudulent. First, the transfer was made to benefit an insider, and Nwokedi and Gemini retained control over this money—or the real property it was used to purchase—after it was transferred. *See* TEX. BUS. & COM. CODE ANN. § 24.005(b)(1)–(2). The evidence also supports the conclusion that Nwokedi attempted to conceal this transfer by refusing to disclose the bank records for the escrow account. *See id.* § 24.005(b)(3); *see also Tanguy v. Laux*, 259 S.W.3d 851, 859 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (finding debtor attempted to conceal transfer of aircraft by waiting sixteen months to file bill of sale). And, it is undisputed that the $175,000 transfer was made after URI sued Gemini. *See* TEX. BUS. & COM. CODE ANN. § 24.005(b)(4). The fact that Nwokedi articulated a purportedly legitimate reason for the transfer—a real estate investment—does not alter our conclusion.

We conclude that the evidence establishes several of the badges of fraud and is thus legally and factually sufficient to support the judgment setting aside this transfer on the basis that it was a fraudulent transfer. *See G.M. Houser, Inc.*, 204 S.W.3d at 843 (presence of several badges of fraud can form basis for inference of fraud); *see also Raley*, 2007 WL 74316, at *7–9 (affirming finding of fraudulent transfer where, among other things, there was evidence that property was

30

transferred to insider but transferor retained control over property, and transferor had been sued prior to transfer); *Garcia*, 2010 WL 183480, at \*4 (affirming finding of fraudulent transfer where, among other things, transfer was made to insider, there was evidence from which inference could be made that transferor attempted to conceal transfer, and transferor retained access to property).

### c. Missing $120,930 from Travelers

The evidence shows that Travelers paid Gemini a total amount of $1,694,267.57. But only $1,573,336.89 of this amount was deposited into Gemini's accounts. The unaccounted for amount of Travelers proceeds equaled $120,930.68. The judgment set this aside this amount as a fraudulent transfer.

Nwokedi and Gemini contend that this was error because URI presented no evidence that either Nwokedi or Gemini made a "transfer" of the $120,930.68. In short, they argue that lost or unaccounted for money cannot support a fraudulent transfer finding as a matter of law.

When first questioned about the missing $120,930.68, Nwokedi testified that he had not seen a check for $120,930.68 or deposited a check for that amount into any account. However, Nwokedi later testified that Travelers paid the $120,930.68 by direct deposit into the Gemini operating account held by Boxer at Amegy Bank, which, according to his earlier testimony, was the account ending in 2692. Nwokedi also admitted that Boxer provided him with copies of the checks

31

deposited into that account along with the monthly bank statements. Nevertheless, Nwokedi did not produce any document showing the $120,930.68 amount was deposited into an account held by Boxer.

Under the UFTA, "transfer" includes "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset . . . and includes payment of money." TEX. BUS. & COM. CODE ANN. § 24.002(12). The only evidence regarding the whereabouts of the missing $120,930.68 was Nwokedi's testimony that this money was not deposited into one of Gemini's accounts, but was instead directly deposited in an account held by Boxer. Nwokedi admitted that he had access to those account records, yet he did not produce them or otherwise show that the $120,930.68 was in fact deposited into this account. The jury could have reasonably concluded from this evidence that Nwokedi received the purportedly missing $120,930.68 and later disposed of or parted with it, within the meaning of the UFTA. *See id.*; *see also id.* § 24.005(b)(1)–(4). Therefore, we hold that legally and factually sufficient evidence supports the finding that this was a fraudulent transfer within the meaning of the UFTA.

### d. $247,615 in Travelers Proceeds Transferred from Account 0589 to Nwokedi Business Venture (NBV) Account 5052

Finally, Nwokedi and Gemini contend it was error to set aside the transfer of the remaining $247,615 because (1) URI cannot properly trace these funds because

32

they were deposited into the 5052 NBV account, a commingled account, and (2) there is insufficient evidence of the badges of fraud to establish the requisite intent.

First, we note that Nwokedi and Gemini's argument relating to commingling and the applicability of the LIBR is not pertinent to our analysis of whether $247,615 was fraudulently transferred from Gemini account 0589 to the NBV account. The UFTA does not require the creditor to trace specific funds, but rather, to prove that a transfer of assets occurred and that the debtor transferred the assets with the intent to hinder, delay, or defraud its creditor.

The evidence shows that between June 2009 and April 2011, Nwokedi made a series of transfers, in varying amounts ranging from $25,000 to $350,000, and totaling $755,000, from the 0589 Gemini account to his personal NBV account. Nwokedi then began writing personal checks to himself and his wife from the NBV account. For example, in June 2009, Nwokedi transferred $140,000 from Gemini account 0589 into the NBV account, which had a beginning balance of $7,710. During that month, the only other deposits, totaling $1,599.96, into the NBV account came from Nwokedi's employer. Therefore, the personal checks Nwokedi wrote himself and his wife during that month, which totaled $14,500, included approximately $5,000 of the funds transferred from account 0589.

Over the course of these two years, Nwokedi wrote personal checks to himself and his wife totaling $606,273.  Nwokedi testified that the NBV account was the operating account used for his business and included deposits from other sources besides Gemini account 0589 totaling $1,000,000 in this two-year period. He further testified that $507,385.32 of the $755,000 transferred from the NBV account was expended to benefit Gemini.  Nwokedi acknowledged that the difference between the $755,000 from Gemini account 0589 and the $507,385.32 expended from the NBV account to benefit Gemini is $247,615 (rounded).  He testified that he could not account for where the remaining money went, but that it was possible that it was used to pay expenses for other properties that he owned or was distributed to himself and his wife directly.

Applying the badges of fraud, we conclude that there is legally and factually sufficient evidence to support a finding that $247,615 of the $755,000 transferred from Gemini account 0589 to the NBV account was fraudulently transferred.  First, the evidence demonstrates that the transfer was made to an insider, Nwokedi or his wife.  *See* TEX. BUS. & COM. CODE ANN. § 24.005(b)(1).  The evidence also shows that Nwokedi retained control over the assets once they were transferred, and that these transfers were not made in exchange for reasonably equivalent consideration. *See id.* § 24.005(b)(2), (8).  Finally, Nwokedi and Gemini concede that these transfers occurred after URI filed suit.  *See id.* § 24.005(b)(4).

34

Based on the foregoing evidence, we conclude that the evidence establishes several of the badges of fraud and is sufficient to support the finding that this transfer was fraudulent.[3] *See G.M. Houser, Inc.*, 204 S.W.3d at 843; *see also Raley*, 2007 WL 74316, at *7–9 (affirming finding of fraudulent transfer where, among other things, there was evidence that property was transferred to insider but transferor retained control over property, and transferor had been sued prior to transfer).

## 3. Individual Liability

Lastly, Nwokedi argues that there is insufficient evidence to hold him individually liable for the fraudulent transfers. First, Nwokedi contends he cannot be held liable for transfers that occurred before October 14, 2011, because no judgment had been entered against him. We reject this argument because tort

---

[3] URI has requested that this court take judicial notice of the bankruptcy proceedings filed by Nwokedi and Gemini, after the entry of the final judgment in this case. URI points us to several facts contained in documents filed in these bankruptcy proceedings as evidence of Nwokedi and Gemini's intent to defraud URI. We note, first, that this was not evidence introduced in the trial court below. Second, while a court may take judicial notice of a fact that is "not subject to reasonable dispute [because] it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," it may not "take judicial notice of the *truth* of factual statements and allegations contained in the pleadings, affidavits, or other documents in the file." *Guyton v. Monteau*, 332 S.W.3d 687, 693 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *see also In re J.E.H.*, 384 S.W.3d 864, 870 (Tex. App.—San Antonio 2012, no pet.) (noting that a court may take judicial notice that a pleading has been filed in the case, but it may not take judicial notice of the truth of the allegations in its records). Accordingly, we do not consider the bankruptcy filings.

35

claimants may assert claims under the UFTA based on pending, unliquidated tort claims. *See* TEX. BUS. & COM. CODE ANN. § 24.002(3)–(4); *Redmon*, 202 S.W.3d at 241; *Blackthorne*, 61 S.W.3d at 443–44.

Nwokedi also argues that he cannot be held individually liable because there was no evidence that any of the assets transferred were assets of Nwokedi. We likewise reject this argument because a corporate officer who knowingly participates in tortious or fraudulent acts may be held individually liable to third persons even though he performed the act as an agent of the corporation. *Walker*, 232 S.W.3d at 918; *Glattly*, 177 S.W.3d at 448.

Accordingly, we hold that the trial court did not err in setting aside the fraudulent transfers and we overrule Nwokedi and Gemini's fourth point of error.

## Constructive Trust

In their fifth point of error, Nwokedi and Gemini argue that the trial court erred in imposing a constructive trust. First, they argue that there is insufficient evidence of fraud or fraudulent transfer and, therefore, a constructive trust may not be imposed. As we have already found sufficient evidence of both fraud and fraudulent transfers, we reject this argument. Second, they argue that a constructive trust is improper because URI did not clearly trace the insurance proceeds, a portion of which were commingled with Nwokedi's assets in the NBV account.

The trial court's judgment imposed "a constructive trust on the insurance company proceeds wrongfully and fraudulently obtained by [Nwokedi and Gemini]" in the amount of $618,545. A constructive trust is an equitable remedy created by the courts to prevent unjust enrichment. *Garcia v. Garza*, 311 S.W.3d 28, 40 (Tex. App.—San Antonio 2010, pet. denied). In order to be entitled to a constructive trust, the party must prove the following elements: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; (3) and tracing to an identifiable res. *Hahn v. Love*, 321 S.W.3d 517, 533 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). In other words, the proponent must be able to trace the specific property on which he seeks to impose the trust. *See Wilz v. Flournoy*, 228 S.W.3d 674, 676 (Tex. 2007); *Sw. Livestock & Trucking Co. v. Dooley*, 884 S.W.2d 805, 811 (Tex. App.—San Antonio 1994, writ denied). Once the party seeking to impose a constructive trust has satisfied the initial burden of tracing the funds to the specific property to be recovered, the entire property will be treated as subject to the trust, except in so far as the trustee may be able to distinguish and separate that which is his own. *Wilz*, 228 S.W.3d at 676. Furthermore, if the funds cannot be traced, a cash judgment may still be entered. *Sw. Livestock*, 884 S.W.2d at 811.

URI traced $714,428.58 of the proceeds from Travelers to Gemini account 2056, and from that account to Gemini account 0589. URI also traced another

check from Travelers, in the amount of $213,666.91, to Gemini account 0589. From that account, URI then traced $75,000 to the account ending in 2696 and $175,000 to the offshore account held at Intercontinental Bank. Additionally, URI traced $755,000, $507,385 of which was used to benefit Gemini, from Gemini account 0589 to the NBV account. We conclude that URI has sufficiently traced $497,615[4] of the amount on which the constructive trust was imposed.

However, URI was unable to trace the remaining $120,930, which the trial court determined was subject to the constructive trust. The settlement agreement between Travelers and Gemini reflects that the total amount Travelers paid Gemini was $1,694,267.57. Only $1,573,336.89 of this total amount was deposited into Gemini's accounts, leaving the difference of $120,930.68 unaccounted for. Because URI was unable to trace the missing $120,930.68, we hold that it cannot be made the subject of a constructive trust. *See Hahn*, 321 S.W.3d at 533.

Accordingly, we modify the trial court's judgment to omit the untraced $120,930.68 from the constructive trust. *See Wilz*, 228 S.W.3d at 676; *Southwest Livestock*, 884 S.W.2d at 811.

### URI's Attorney's Fees

In their seventh point of error, Nwokedi and Gemini argue that URI is not entitled to recover its attorney's fees because URI chose to recover tort damages,

---

[4] This represents the sum of $75,000, $175,000, and the difference between $755,00 and $507,385.

38

and, therefore, URI cannot recover attorney's fees for breach of contract under Chapter 38. Nwokedi and Gemini do not otherwise challenge the fee award.

The trial court could have properly awarded reasonable attorney's fees under the UFTA. *See* TEX. BUS. & COM. CODE ANN. § 24.013 (West 2009). Therefore, we overrule Nwokedi and Gemini's seventh point of error.

### Sanctions and Remand for Determination of Attorney's Fees

In their eighth and ninth points of error, Nwokedi and Gemini argue that the trial court erred in imposing post-judgment sanctions and appointing a receiver. They also urge us to remand for a determination of the amount of attorney's fees recoverable by Nwokedi and Gemini. However, their arguments are contingent upon this Court reversing the liability findings against them. Because we have upheld the jury's liability findings based on fraud and fraudulent transfer, we overrule Nwokedi and Gemini's eighth and ninth points of error.

### Conclusion

We modify the trial court's judgment to omit the untraced $120,930.68 from the constructive trust and affirm the judgment of the trial court as modified.


Rebeca Huddle
Justice

Panel consists of Justices Keyes, Sharp, and Huddle.

39