**Opinion issued August 4, 2016**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-14-00816-CV

_____

**CUROCOM ENERGY LLC AND CURO HOLDINGS CO. LTD., Appellants**

**V.**

**WONG SOON EEM AND JASON KIM, Appellees**

On Appeal from the 165th District Court
Harris County, Texas
Trial Court Case No. 2009-06630

## MEMORANDUM OPINION

This appeal arises out of a dispute between two Korean conglomerates over

the sale of a working interest in the Caliente Field, part of the Eagle Ford Shale. The

field is located in Karnes County, Texas. In its first oil and gas investment, Woolim

Construction Company, a Korean firm, formed Woolim Energy Holdings LLC, a

United States corporation, to purchase the working interest in mid-2006. Woolim decided to sell its interest a few months later.

Woolim identified another Korean firm, Curocom Energy LLC, as a potential buyer. It transferred its interest in the Caliente Field to Curocom effective July 2007. After the sale, Curocom learned that Woolim had not disclosed data that it had received from one of its analysts before the sale closed. That data indicated that its Caliente Field interest was worth less than half the amount suggested by other reserve reports that Woolim had provided to Curocom during their negotiations.

Curocom and its related entities sued Woolim and Woolim's related corporate entities, Woolim's oil and gas consultants, and several Woolim individual employees involved in the transaction, including Woong Soom Eem, the managing director of Woolim Energy Holdings and Woolim Resource Development, and Jason Kim, who managed the Houston office of Woolim Resource Development.

Curocom tried its claims for statutory fraud, common-law fraud, conspiracy to commit fraud, and breach of contract to a jury. The jury found several Woolim entities liable and Eem and Kim individually liable. Woolim moved for judgment notwithstanding the verdict, which the trial court granted as to Eem and Kim. The trial court otherwise rendered judgment on the verdict.

On appeal, Curocom contends that the trial court erred in granting the motion for JNOV as to Eem and Kim because (1) the trial court relied on a ground not raised in the motion; (2) Eem and Kim are liable in their individual capacities in addition to their corporate capacities; and (3) legally sufficient evidence supports findings of personal liability as to Eem and Kim. We hold that the trial court properly granted judgment notwithstanding the verdict as to Kim in his individual capacity, but we reverse the judgment as to Eem.

## BACKGROUND

Because this appeal is limited to the individual judgments in favor of Eem and Kim, we focus on the facts relevant to those rulings. When the underlying events occurred, Eem lived in Korea and performed most of his job functions there. Eem worked for Woolim Construction Company and served as its managing director of some Woolim's subsidiaries involved in this transaction, including Woolim Resources Development, Ltd. and Woolim Energy Holdings, as well as a Los-Angeles based subsidiary. He occasionally traveled to the United States to meet with Woolim's employees in California and Texas. Eem held a master's degree in Economics, but had no experience in the oil and gas industry when Woolim undertook the Caliente Field investment.

Kim received his bachelor's degree in economics in 2006 and began working for Woolim Construction in Los Angeles shortly thereafter. Like Eem, Kim had no

3

background in oil and gas. Kim relocated from California to Houston so that Woolim would have a presence in its office near its anticipated investment.

*Woolim acquires the Caliente Field Interest*

Woolim became interested in the possibility of investing in United States' oil and gas properties and put Eem in charge of looking for an opportunity. Lacking knowledge and experience in oil and gas, Eem met with Park Hee-Won Park, president of Korea Energy Investment, LLC, a prominent petroleum engineering company in Korea. Woolim retained Park as a technical consultant. Woolim also engaged John Myung, a Korean petroleum engineer who had spent most of his career in the United States and resided in Houston, as a consultant. Myung identified oil and gas investment opportunities for his clients. He also provided engineering consulting services to help investors in the oil and gas business optimize their production.

Myung met with Dan Hughes, an owner of working interests in the Caliente Field, and identified these interests as a potential for an investment to Park. Park then contacted Woolim and arranged a meeting with Myung about the opportunity. At the meeting, which was attended by Woolim's Chairman, Young-sub Shim, and several other executives, Myung presented information about the Caliente Field interest that Hughes was offering for sale.

The presentation piqued Woolim's interest. Chairman Shim, Myung, and other Woolim employees traveled to Texas to meet with Hughes. Hughes provided Myung with a reserve report prepared by Albrecht and Associates "to assist prospective purchasers in their evaluations" of the offered properties. Myung forwarded the Albrecht report to Woolim.

Dan Hughes also reported to Myung that petroleum engineer Oladipo Aluko was familiar with the Caliente Field because he had provided technical consulting services in connection with the field in the past. Park and Myung emailed Aluko regarding the prospective deal between Woolim and Hughes, but they did not obtain any documentation from Aluko before Woolim made its investment.

After reviewing the materials that Hughes had provided, Myung concluded that the interest had reserves that offset existing production and, based on the data presented in the Albrecht report, recommended that Woolim acquire it. Meanwhile, in Korea, Park provided the Albrecht report to the Korea Institute of Geosciences (KIGAM) to use in preparing its own reserve report, a prerequisite of obtaining the loan that would in part fund Woolim's investment.

Before proceeding with the transaction, Woolim retained the Korean accounting firm of Samil PriceWaterhouse Coopers to perform an audit based on information that Park had provided to KIGAM. KIGAM also obtained production history information from the Texas Railroad Commission.

5

Woolim relied on Myung's technical advice in negotiating a purchase price. In July 2006, Woolim bought the Caliente Field interest from Hughes for $23 million. The deal included an agreement to retain Hughes to rework some of the wells.

*Woolim sells the Caliente Field interest to Curocom*

Several months into the rework project, Myung learned from Park that Woolim was not pleased with the Caliente Field's production. Woolim decided to divest itself of the Caliente Field investment and use the money to pursue real estate development and oilfield exploration in Kazakhstan. Woolim began to search for a potential buyer, and it tasked Park with preparing a report reflecting the rework's effectiveness.

Park then learned from Hughes that Aluko had prepared a well testing report for the Caliente Field. At Park's request, Myung met with Aluko in February 2007. Myung asked Aluko to prepare a report showing reserve and economic analysis after the rework so that Park could evaluate it. When Aluko estimated that his fee for the report would be approximately $6,000 to $8,000, however, Myung and Park knew that Woolim would not agree to the expense. Instead they asked Aluko to provide just the production and reserve numbers so that Park could prepare an analysis from them.

6

In June 2007, Aluko provided Myung and Park with 12 pages of data, consisting of charts entitled "Reserves and Economics" as of July 1, 2007. Aluko did not charge Woolim for the data because Hughes had paid him to collect it in connection with preparation of Hughes's income tax returns. Unlike the Albrecht report, the Aluko data is not analyzed or signed by the preparer.

Park received the collection of data from Aluko and forwarded the document as an email attachment to Eem, noting: "This is the result on Caliente producing wells analysis by Dr. Dipo. Please take as reference." Eem, in turn, forwarded the document to Kim and two other employees in Woolim's offices in Korea, noting: "Confidential. Please use for reference only."

Meanwhile, Eem, who had attended college with Curocom's CEO, told Curocom about the Caliente Field investment. He directed him to Park for technical information about the Caliente Field. After Curocom contacted Park, Eem told Kim that Curocom was interested in buying the interest. The parties arranged a June 2007 meeting in Houston for a sales presentation.

Park was in charge of the presentation. The night before the meeting, he sent an email to Kim with a Powerpoint presentation attached. He asked Kim to make copies and bind all but one of them for the meeting. Other than performing this administrative task, Kim did not prepare anything for the meeting or present anything at it.

Eem invited Myung to the meeting for the technical discussion because he and Park had the most technical information about the Caliente Field. Myung attended the meeting, but did not make any formal presentation. Park's presentation included the Albrecht report, but he did not present the Aluko data received two days before the meeting. Park did not transmit or mention this data to Curocom; neither did anyone else.

The Aluko data challenged the proved developed reserves identified in the Albrecht report. Curocom eventually paid $30 million for the project, but Curocom's expert opined that, based on the Aluko data, the Caliente Field interest had a substantially lower fair market value, of approximately $9.5 million.

Eem negotiated the sale price with Curocom. On July 14, Eem sent Curocom's CEO an email, attaching a link to what he described as "comparative analysis material." The material related to a transaction with Tristone Capital in the Barnett Shale, which Eem explained, was about twice as large as the Caliente Field interest and had greater exploration and development risks. Eem stated, "[b]ased on the above, our company's Caliente is worth (price) at least 40 million dollars. Please consider the fact that according to the Al[brecht] data, our company's project was proposed at 43 million dollars." Eem did not mention the Aluko data that Park had forwarded to him three days earlier.

The sale closed at a price of $30 million without disclosure of the Aluko data. In December 2007, Myung recommended that Curocom's auditor hire Aluko to prepare a reserve report for the company. Curocom learned for the first time that the earlier Aluko data showed that the Caliente Field interest had no proved undeveloped reserves to offset existing production. Curocom's representative in Texas consulted Myung; Curocom then discovered that Myung had received data from Aluko before the July 2007 sale.

The disparities between the amounts of undeveloped reserves reported by Albrecht and those identified in the Aluko data, and the failure to disclose the Aluko data to Curocom, led to this lawsuit. The jury found Woolim Energy, Woolim Resources, and Korea Energy Investment liable for fraud and breach of contract. With respect to Eem, the jury found that he was liable for statutory fraud and common-law fraud under both misrepresentation and nondisclosure theories. With respect to Kim, the jury found liability for statutory fraud only. The jury awarded $20.3 million in actual damages in connection with both liability theories, and it assessed proportionate liability among the defendants that it found liable. The jury also found certain of the defendants liable for exemplary damages, including Eem. It assessed $1 million in punitive damages against him.

The trial court granted judgment notwithstanding the verdict as to Eem and Kim "[i]n light of the holding in *Cox v. State*," 448 S.W.3d 497 (Tex. App.—Amarillo 2014, pet. denied). It denied the remaining defendants' motions to set aside the verdict. In its final judgment, the trial court awarded actual damages against the remaining defendants of $20.3 million, punitive damages against the defendants who were found to be liable, attorney's fees, and interest.

Initially, both parties appealed the trial court's judgment. After its trial counsel withdrew, however, the Woolim defendants did not engage new counsel and did not file briefs in our court. We have dismissed their appeals for want of prosecution. Curocom appeals the trial court's decision to grant judgment in favor of Eem and Kim.

## DISCUSSION

### I. Standard of Review

A trial court may grant a motion for judgment notwithstanding the verdict if a directed verdict would have been proper, and it may disregard any jury finding on a question that is immaterial or has no support in the evidence on issues necessary to impose liability. TEX. R. CIV. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994); *Pills & Collard L.L.P v. Schechter*, 369 S.W.3d 301, 320 (Tex. App.—Houston [1st Dist.] 2011, no pet.). In reviewing a trial court's judgment notwithstanding the verdict, we

determine whether any evidence supports the jury's finding, viewed in the light most favorable to the verdict. *Tiller*, 121 S.W.3d at 713; *see also B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 15 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *City of Keller,* 168 S.W.3d at 822.

No evidence exists when there is (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact. *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 347 (Tex. 2015) (citing *City of Keller*, 168 S.W.3d at 810).

## II.     Propriety of the JNOV as to Eem and Kim

On appeal, Curocom challenges the trial court's ruling on procedural and substantive grounds. Procedurally, it contends that the trial court improperly relied on a ground not raised in the motion for judgment notwithstanding the verdict to rule in favor of Eem and Kim. Substantively, it contends that the trial court erred in determining that no evidence exists to support a finding of individual liability as to Eem and Kim.

11

### A. The trial court relied on grounds expressly raised in the motion.

Curocom contends that the Woolim defendants did not cite *Cox v. State* in their written motion for JNOV, and the trial court thus erred in relying on that case in its order granting relief. On the contrary, paragraph 29, page 11 of the Woolim defendants' written motion for JNOV expressly cites *Cox* to support its contention that "[a] false promise by Woolim Resources alone cannot be treated as a false promise made by any other Defendant especially in light of no alter ego pleading, jury issue, or jury finding." We therefore reject this challenge as unfounded in the record.

Curocom further contends that the trial court erred in ostensibly relying on *Cox*'s "hold[ing] that a corporate officer's acts as the 'guiding spirit' behind corporate violations of the Deceptive Trade Practices Act fail to create personal liability for an officer." This contention is unavailing for two reasons. First, the Woolim defendants' motion for JNOV and the trial court's order demonstrate that the trial court did not rely on the federal "guiding spirit" doctrine for determining whether Eem and Kim could be held liable for Woolim's conduct. Second, the *Cox* court did not make a determination about whether the guiding spirit doctrine was useful in determining corporate versus individual liability; it only observed that the DTPA did not include the doctrine, and it deferred to the legislature the decision whether to adopt it as a basis for individual liability under the DTPA. *See* 446

12

S.W.3d at 503. *Cox'*s holding relates to whether Cox, a certified public accountant who was the president, chief executive officer, chairman of the board, and majority holder of Tax Masters, Inc. could incur individual liability without either a showing that he personally engaged in conduct violative of the DTPA or an evidentiary basis for piercing the corporate veil. *See id.* at 503–04. It was upon that proposition that the trial court relied.

## B. The trial court properly held that no evidence supports personal liability as to Kim, but some evidence supports the finding against Eem.

A corporate officer who knowingly participates in tortious or fraudulent acts may be held individually liable to third persons even though he performed the act as an agent of the corporation. *Nwokedi v. Unltd. Restoration*, 428 SW 3d 191, 201 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). We therefore focus our legal-sufficiency review on whether there is evidence that either Kim or Eem personally engaged in the fraud that supports the jury's findings against the Woolim entities and other individuals.

### 1. Kim

Curocom claims that legally sufficient evidence supports the verdict against Kim personally based on his failure to disclose the Aluko data to Curocom. Curocom's statutory fraud claim provides the basis for the jury's sole affirmative finding that Kim committed fraud. Under the Texas Business and Commerce Code,

to establish a cause of action for statutory fraud in a real estate transaction, a plaintiff must show: (1) a false representation of a past or existing material fact, (2) made to a person for the purpose of inducing that person to enter into a contract, and (3) relied on by that person in entering into that contract. TEX. BUS. & COM. CODE ANN. § 27.01(a) (West 2012).

> The instruction supporting the statutory fraud question informed the jury:
>
> Fraud occurs when—
> a. there is a false representation of a past or existing material fact,
> b. the false representation is made for the purpose of inducing that person to enter into a contract, and
> c. the false representation is relied on by that person in entering into that contract.
> *or*
> a. a party makes a false promise to do an act,
> b. the promise is material,
> c. the promise is made with the intention of not fulfilling it,
> d. the promise is made to a person for the purpose of inducing that person to enter into a contract, and
> e. that person relies on the promise in entering into that contract.

This instruction does not support a finding under the nondisclosure theory that Curocom urges here.[1] The charge gave the jury a fraud by nondisclosure instruction

---

[1] Curocom cites *Keathley v. Baker*, an opinion from the Tyler Court of Appeals, for the proposition that statutory fraud includes Curocom's nondisclosure theory. *See* No. 12-11-00151-CV, 2013 WL 1342524, at *7 (Tex. App.—Tyler Apr. 3, 2013, no pet.). That case involved claims for both statutory and common-law fraud. The Tyler court discussed fraud by nondisclosure after reciting the elements of a statutory fraud claim, but it did not suggest that fraud by nondisclosure was part of statutory fraud, and its citation to the common-law fraud discussion in *Lesikar v. Rappeport*, 33 S.W.3d 282 (Tex. App.—Texarkana, pet. denied), shows that its

in the common-law fraud question, but the jury did not find that Kim committed common-law fraud. Curocom does not advance any other argument for reversing the jnov as to Kim personally on the statutory fraud finding.

Because the sole finding against Kim does not support personal liability, the conspiracy finding cannot support it either. *See Tilton v. Marshal*, 925 S.W.2d 672, 681 (Tex. 1996) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.") Accordingly, we hold that the trial did not err in granting the motion for jnov and entering a take-nothing judgment on Curocom's claims against Kim.

### 2.    Eem

The jury found Eem liable for both common-law fraud and statutory fraud. We first consider whether legally sufficient evidence exists that Eem made a misrepresentation, which would support the jury's findings against him for both common-law fraud and statutory fraud. The jury charge contains the following instruction:

---

discussion of fraud by nondisclosure was grounded in the common law, not statute. See 2013 WL 1342524, at *7 (citing *Lesikar*, 33 S.W.3d at 299).

15

[F]raud occurs when—

a.     a party makes a material misrepresentation,

b.     the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,

c.     the misrepresentation is made with the intention that it should be acted on by the other party, and

d.     the other party relies on the misrepresentation and thereby suffers injury.

"Misrepresentation" means:

a. A false statement of fact;
b. A promise of future performance made with an intent, at the time the promise was made, not to perform as promised;
c. A statement of opinion based on a false statement of fact;
d. A statement of opinion that the maker knows to be false; or
e. An expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion.

"Special knowledge" means:

Knowledge or information superior to that possessed by the other party and to which the other party did not have equal access.

Fraud also occurs when a defendant has a duty to disclose and—

a. A defendant failed to disclose a material fact within its or his knowledge, and
b. knew Curocom . . . was ignorant of the fact and did not have equal opportunity to discover the truth, and
c. by failing to disclose the fact, intended to induce Curocom . . . to enter into the agreement, and
d. Curocom . . . entered into the agreement as a result of acting without knowledge of the undisclosed fact.

16

In addition, if any defendant voluntarily disclosed information he had a duty to disclose the whole truth; if he made a representation he had a duty to disclose new information if he became aware that the new information made the earlier representation misleading or untrue; and he had a duty to correct a false impression conveyed by a partial disclosure.

A misrepresentation or omission is "material" if it would be likely to affect the conduct of a reasonable person with reference to the transaction in question.

Curocom relies on Eem's email statement to Curocom that the Caliente Field interest's market value was comparable to other transactions and worth $40 million as a false representation of a material fact. "Whether a statement is an actionable statement of 'fact' or merely one of 'opinion' often depends on the circumstances in which a statement is made." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 338 (Tex. 2011) (quoting *Transport. Ins. Co. v. Faircloth*, 898 S.W.2d 898 S.W.2d 269, 276 (Tex. 1995)). Courts consider circumstances like the statement's specificity, the speaker's knowledge, the comparative levels of the speaker's and hearer's knowledge, and whether the statement relates to the present or future. *Faircloth*, 898 S.W.2d at 276. "In cases like these, '[t]he decisive test . . . is whether the seller asserts a fact of which the buyer is ignorant or merely states an opinion or judgment on a matter of which the seller has no special knowledge *and* on which the buyer may be expected also to have an opinion and to exercise his judgment.'" *Steptoe v. True*, 38 S.W.3d 213, 218 (Tex. App.—Houston [14th Dist.]

17

2001, no pet.) (emphasis in original) (quoting *Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 463 (Tex. App.—Dallas 1990), *writ denied*, 800 S.W.2d 853 (Tex.1991) (per curiam)).

Eem's email characterized the Tristone Capital transaction as comparable to the proposed Caliente Field sale, but it pointed to various differences between the two areas, including risk factors. Eem concluded that, "Based on [a recent Tristone Capital trade, linked in the email], our company's Caliente is worth (price) at least 40 million dollars. Please consider the fact that according to the Albr[echt] data, our company's project was proposed at 43 million dollars."

The circumstances show that Eem's valuation is an opinion based on a comparable sale. Curocom's CEO could make an independent assessment of the proposed comparable sale based on the primary source documents that Eem linked in the email. We hold that Curocom has not demonstrated that the trial court erred in considering this statement to be nonactionable opinion.

Curocom further claims that Eem personally misrepresented the Caliente Field interest's value because he omitted the Aluko data in the email with his value estimate, and had received the data three days before he sent the email. The Aluko data, however, did not contain an estimated value for the Caliente Field interest or an analysis for determining that value. At trial, the uncontroverted evidence was that Eem lacked the expertise to analyze the data; for that, he relied on Park and

Myung. No evidence shows that Park or Myung had provided Eem with a valuation analysis of the Aluko data. Curocom presented an expert witness to testify to the Caliente Field interest's value pursuant to the Aluko data, but no evidence demonstrates that this valuation was available to Eem at the time he sent the email. As a result, the record does not support the statutory fraud and common-law fraud finding against Eem based on a misrepresentation-of-value theory.

But the data nevertheless was material to determining a purchase price for the interest and Eem failed to disclose it. In contending that Eem committed fraud by nondisclosure, Curocom points to Eem's silence during Park's presentation to Curocom in Houston as a second opportunity to disclose the Aluko data. It notes that Eem received an email from Park with the Aluko data two days earlier. Eem forwarded the email to Kim and employees in Korea as "Confidential, please use for reference only." Thus, Eem acted on the email from Park but did not ask Park to provide the data to Curocom. When Curocom's chief executive officer later confronted Eem with the data, Eem denied that he knew about it. Eem also later wrote an email indicating that he would rely on his ignorance of geologic matters as a defense to failing to disclose the data. Eem was undisputedly charged with making decisions regarding the Curocom transaction and overseeing Park's work. It was to Eem that Park provided the data when Park received it from an outside source.

19

Eem's decision to restrict disclosure of the email containing the reserve data, confidentially forward it to his colleagues at Woolim, attend the meeting in which Park presented reserve reports to Curocom but not the Aluko data that Park had provided to Eem, his after-the-fact effort to either conceal that he had knowledge of the data or claim ignorance of its import, and his position as the chief negotiator of the purchase price and managing director of the subsidiary charged with making the deal, taken together, support a reasonable inference that Eem personally participated in the decision with Park to withhold the Aluko data from Curocom, with the intent to induce Curocom into the sale. Further, the Woolim defendants during the trial admitted that Woolim's agreement with Curocom required disclosure of this data. Thus, some evidence supports each of the elements of common-law fraud upon which the jury was instructed and for which it imposed liability on Eem.

Eem has not filed a responsive brief to controvert the evidence and arguments submitted by Curocom on appeal in support of the jury's verdict, nor has he otherwise participated in this appeal. Thus, Curocom's arguments about the state of the evidence and its legal effect are uncontroverted. *See* TEX. R. APP. P. 38.1(g). Because a reasonable jury could infer that Eem personally and knowingly participated in a decision to withhold the material Aluko data with the intent to induce Curocom into purchasing Woolim's interest in the Caliente Field at an inflated price, and knew that he had a duty to disclose such data as evidenced in the

20

parties' agreements, we hold that the trial court erred in granting judgment notwithstanding the verdict as to Eem on Curocom's claim against him for common-law fraud.

## CONCLUSION

We hold that the trial court did not err in granting the motion for judgment notwithstanding the verdict as to Kim's personal liability, but we reverse and reinstate the jury's verdict with respect to Eem's personal liability. We therefore affirm in part, reverse in part, and remand the case to the trial court for entry of a judgment consistent with this opinion.


Jane Bland
Justice

Panel consists of Justices Bland, Brown, and Lloyd.