**Opinion issued August 6, 2019**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-18-00314-CV**

———————————

**SPENCER & ASSOCIATES, P.C. D/B/A THE SPENCER LAW FIRM, Appellant**

**V.**

**STEPHEN HARPER, VICKI HARPER AND ZO ENERGY, INC., Appellees**

---

**On Appeal from the 189th District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-88479**

---

**O P I N I O N**

This case arises out of attempts by appellant Spencer & Associates, P.C. *d/b/a*

the Spencer Law Firm (the Firm) to execute on a 1999 judgment rendered in its favor

against appellee Stephen Harper. After the Firm propounded post-judgment

discovery requests to Harper and appellees Vicki Harper and ZO Energy, Inc. (collectively, the Harper parties) and received interrogatory responses, the Firm sued the Harper parties for common-law fraud, fraud by nondisclosure, violation of the Texas Uniform Fraudulent Transfer Act (TUFTA), and conspiracy to commit fraud. The Harper parties moved for no-evidence summary judgment on all of the Firm's claims. The trial court granted summary judgment in favor of the Harper parties, rendering a take-nothing judgment against the Firm. On appeal, the Firm argues that the trial court erred in granting summary judgment because it raised a genuine issue of material fact on each element of its causes of action.

We reverse and remand.

## Background

More than two decades ago, an entity related to Stephen Harper retained the Firm for legal representation. After the representation concluded, the Firm sued Harper for unpaid legal fees in the Harris County Civil Court at Law Number One. In 1999, the county court rendered judgment in favor of the Firm, awarding the Firm $33,237.28 in damages and $5,000 in attorney's fees, and it ruled that post-judgment interest would accrue on this amount at a rate of 10% per year. Harper did not appeal, and this judgment became final. In the twenty years since the county court rendered

its judgment, Harper has resisted all attempts to execute on the judgment, and the Firm has been unable to obtain satisfaction of the judgment from Harper.[1]

As part of its efforts to collect upon the county court judgment awarded to it, the Firm engaged in extensive post-judgment discovery and litigation. The Firm sought information concerning the existence of Harper's nonexempt assets from Harper himself, his wife Vicki Harper, and ZO Energy, an oil and gas company for which Vicki owns 100% of the stock, among other entities that are not parties to the underlying proceeding or this appeal. During the course of this discovery, the Firm issued requests for production and interrogatories to all of the Harper parties, and it took the depositions of Harper and Vicki.

In December 2016, the Firm sued Harper, Vicki, and ZO Energy. The Firm asserted causes of action for common-law fraud, fraud by nondisclosure, negligent misrepresentation, violations of TUFTA, conspiracy to commit fraud, and aiding and abetting.[2] The Firm alleged that Harper had "consistently and purposefully evaded collection efforts," serving as the president and director of ZO Energy but reporting that he "has no income or money and no non-exempt assets." The Firm also alleged

---

[1] The Firm alleged that Harper has not voluntarily paid any portion of the judgment entered against him. According to the Firm, it successfully garnished Harper's bank account in 2002, "resulting in a credit of $3,354.25," but the remainder of the judgment is still unsatisfied.

[2] The Firm later nonsuited its claims for negligent misrepresentation and aiding and abetting.

that Vicki had conspired with Harper to thwart the Firm's efforts to collect its debt, claiming that she runs ZO Energy while, in actuality, Harper "has significant involvement in running ZO Energy but receives no compensation for his services" and "ZO Energy and/or Mrs. Harper pay for Mr. Harper's personal expenses and therefore can claim that Mr. Harper has no income."

The Firm alleged that the Harper parties "lied under oath [and] made misrepresentations and omissions of material fact in order to mislead Spencer and encumber its debt collection efforts." The Firm alleged that, when responding to post-judgment discovery requests, the Harper parties "had a duty to provide truthful, complete and accurate information" concerning Harper's financial situation, but instead the Harper parties failed to provide material information and purposefully misled the Firm. The Firm also alleged that the Harper parties violated TUFTA by making "several transfers . . . between the parties, wherein Mr. Harper received little or no value for such transfer" in an effort to place Harper's assets beyond the reach of the Firm.

The Harper parties moved for no-evidence summary judgment, challenging each element of each cause of action asserted by the Firm. The Harper parties characterized the Firm's suit as "the next effort in a long line of harassing legal proceedings aimed at Mr. Harper and every entity or person with which he has any connection," and it noted that a receiver had been appointed in the county court case

4

to assist in collection of the Firm's judgment against Harper. The Harper parties argued that, throughout the years, they had produced thousands of documents to the Firm, "including income tax returns, bank statements, corporate documents, and credit card statements," but the Firm had been unable to produce any evidence that Harper possesses assets to satisfy the judgment against him. The Harper parties pointed out that the Firm did not allege any specific misrepresentation or fraudulent transfer in its petition.

In response to the Harper parties' summary-judgment motion, the Firm identified several misrepresentations allegedly made by the Harper parties during the course of post-judgment discovery that served as the basis for the Firm's fraud claims. The Firm argued that, in sworn interrogatory answers dated May 24, 2013, Harper misrepresented that he had only one bank account with Broadway Bank that had a balance of less than $1.00. However, Harper also had an account with USAA Federal Savings Bank that "held non-exempt securities and cash with a value of over $12,000," but Harper never identified this account during post-judgment discovery or supplemented his interrogatory answers. As summary judgment evidence, the Firm attached Harper's interrogatory answers as well as bank statements from USAA Federal Savings Bank indicating that, as of September 30, 2013, an account in the name of "Steve J Harper and Vicki D Harper Com Prop" held "Small cap stocks/funds" and "Cash/money market funds" and had a portfolio value of

5

$12,117.52. The bank statement included a graph depicting "Portfolio performance" that displayed activity starting in late 2011. The Firm also attached a bank statement indicating that, as of March 31, 2014, the value of the portfolio was $8,079.54, a withdrawal of $8,079.39 then occurred, and, thus, as of June 30, 2014, the value of the portfolio was $0.15.

The Firm pointed to Harper's interrogatory answer that he earned no income in 2012 or 2013 as an additional misrepresentation. According to the Firm, Harper received $7,355.68 in royalty income in 2012, and, in 2013, he reported income of $799,441 from a sole proprietorship and $130,943 in royalty income. As evidence, the Firm attached a Form 1099 issued by Forest Oil Corporation to Harper, reflecting the payment of $7,355.68 in royalties during the 2012 tax year. The Firm also attached the Harpers' 2013 tax return, in which they reported receiving $109,395 for "Rental real estate, royalties, partnerships, S corporations, trusts, etc." Their 2013 tax return also included a Schedule C for "Profit or Loss from Business (Sole Proprietorship)." This scheduled listed "Stephen J Harper" as the proprietor, listed "working interest" as the "Principal business or profession," and listed $799,441 for gross income. With respect to the question "Did you 'materially participate' in the operation of this business during 2013?" Harper checked the box for "Yes."

Finally, the Firm alleged that Vicki made misrepresentations during a March 2015 deposition. Specifically, she represented that Harper made no money, that he

6

rarely consults with ZO Energy, and that he is not affiliated with ZO Energy. As evidence that these representations were false, the Firm pointed to documents relevant to Harper's income taxes, as well as evidence that Harper was the sole officer and director of ZO Energy in 2015, and testimony from Vicki's 2018 deposition that both she and Harper run ZO Energy and that Harper can withdraw money from ZO Energy at his discretion.

The Firm argued that each of these misrepresentations was material because Harper's financial status was "important and would be relied upon by a judgment creditor when deciding how to enforce and collect its judgment." The Firm argued that if this information about Harper's finances had been disclosed, it "could and would have attached Stephen Harper's hidden, nonexempt property to satisfy its judgment." It further argued that Harper "knew, or had reason to believe, that if he did not identify the existence and source of his assets—especially easy-to-hide assets like cash—that it would be virtually impossible for [the Firm] to locate and execute upon those assets." The Firm argued that Vicki Harper knew

> that if she did not identify the existence and source of her husband's income—especially in light of her 2015 testimony that her husband "makes no money" and "is not affiliated with" her company ZO Energy—that it would be virtually impossible for [the Firm] to discover that Stephen Harper was in fact performing substantial amounts of work for ZO Energy, was diverting all of his income to his wife and ZO Energy, and was also earning money to the tune of half-a-million-dollars per year at times.

The Firm argued that it actually relied on these misrepresentations "by failing to act toward attaching Stephen Harper's nonexempt assets, by losing the opportunity to so act, and by losing the opportunity to obtain satisfaction of its judgment had the Defendants spoken truthfully and disclosed the assets."

As summary judgment evidence, the Firm attached the affidavit of Bonnie Spencer, the principal of the Firm. She averred:

> The Law Firm has a judgment against Stephen Harper. Over the last two decades, The Law Firm has continuously attempted to collect its judgment. The Law Firm sent post judgment discovery requests to Stephen Harper and received answers dated May 24, 2013, a true and correct copy of which is attached to the Response at Exhibit D. The Law Firm also took the deposition of Vicki Harper on March 23, 2015. The Law Firm relied upon the statements made under oath in Stephen Harper's answers to post-judgment Interrogatories and relied upon Vicki Harper's testimony under oath. The Law Firm remained unaware of the assets and, given Stephen and Vicki Harper's statements and the nature of the assets, the existence and location of these assets were virtually unknowable.

> However, the Law Firm later discovered that Stephen Harper provided partial, false, and misleading answers in his Interrogatories as described in the Response. Vicki Harper provided partial, false, and misleading answers in her deposition as described in the Response. The Harpers' resistance to comply with discovery and their legal duties to speak truthfully, have damaged the Law Firm. Specifically, these false answers increased the time and effort the Law Firm's attorneys have had to spend to locate nonexempt assets of Stephen Harper. As a result of the Harpers' deception, [the Firm] lost the opportunity to attach nonexempt assets owned by Stephen Harper including, but not limited to, the cash and stock in the USAA bank account.

> Had Stephen Harper been honest in his Interrogatory answers, [the Firm] could and would have obtained at least some satisfaction of its judgment. Had Vicki Harper been honest in her [2015] deposition

8

testimony, [the Firm] could and would have taken the necessary steps to discover and attach Stephen Harper's nonexempt assets to credit toward this judgment.

I have reviewed the hours worked by the Law Firm's attorneys to collect the judgment. The value of the hours worked at the time they were expended is $166,194.18. These hours were expended from June 1, 2013 (which is after the Defendants' misrepresentations described herein) to December 20, 2017 (which is the date a receiver was appointed to aid in collecting the judgment against Harper). These fees are reasonable given the circumstances of the case as described above and within the Response.

With respect to its claim for violation of TUFTA, the Firm argued that the Harper parties violated Business and Commerce Code sections 24.005(a) and 24.006. The Firm argued that the relevant assets that Harper transferred were his income from ZO Energy, his community property interest in ZO Energy, and cash. It argued that Harper earned income from services he performed for ZO Energy, but, instead of collecting that income and depositing it in his own bank account, he allowed ZO Energy to retain those funds. The Firm presented excerpts from Harper's and Vicki's depositions in which both testified that Harper does not maintain his own bank account but instead pays his bills directly out of ZO Energy's bank account. The Firm also presented records reflecting that ZO Energy paid over $200,000 of Harper's credit card bills and his expenses. The Firm also presented evidence that ZO Energy was wholly owned by Vicki and was formed after her marriage, and therefore Harper had a community property interest in ZO Energy, resulting in any shares or distributions from ZO Energy being jointly-managed

9

community property. The Firm argued that Harper's act of allowing ZO Energy and Vicki to retain his income constituted a "transfer" under the terms of TUFTA, that Harper intentionally kept his income in ZO Energy's bank account instead of his own bank account, and that his actions were intended to hinder, delay, or defraud the Firm in the collection of its judgment against Harper.

On March 19, 2018, the trial court granted the Harper parties' no-evidence motion for summary judgment and issued a take-nothing judgment against the Firm. This appeal followed.

## Summary Judgment

The Firm argues that the trial court erred in granting Harper's motion for no-evidence summary judgment because the Firm raised a fact issue on its causes of action for common-law fraud, fraud by nondisclosure, violation of TUFTA, and conspiracy to commit fraud.

### A.     Standard of Review

We review a trial court's ruling on a summary judgment motion de novo. *City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 258 (Tex. 2018). After adequate time for discovery has passed, a party may move for summary judgment on the basis that there is no evidence of one or more essential elements of a claim on which the adverse party would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). The burden then shifts to the nonmovant to present evidence raising a

genuine issue of material fact on each of the challenged elements. TEX. R. CIV. P. 166a(i); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006).

A genuine issue of material fact exists if the evidence rises to a level that enables reasonable and fair-minded people to differ in their conclusions. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004) ("A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced."). Evidence does not create a fact issue when it is so weak as to do no more than create a mere surmise or suspicion that the fact exists. *Parker*, 514 S.W.3d at 220 (quoting *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 875 (Tex. 2014)). We review the evidence presented in the motion and response in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Helix Energy Sols. Grp., Inc. v. Gold*, 522 S.W.3d 427, 431 (Tex. 2017).

**B.** **Analysis**

*1.* ***The Firm's Fraud Claims***

The elements of common-law fraud are:

(1) that a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011); *see Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217 (Tex. 2011). "Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *Italian Cowboy Partners*, 341 S.W.3d at 337. Common-law fraud requires a showing of "actual and justifiable reliance" on the misrepresentation at issue. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (noting that courts must consider whether, given plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before time of alleged fraud, it is extremely unlikely that there is actual reliance and that person may not justifiably rely on representation if "red flags" exist indicating such reliance is unwarranted).

Fraud by nondisclosure is considered a subcategory of fraud. *Blankinship v. Brown*, 399 S.W.3d 303, 308 (Tex. App.—Dallas 2013, pet. denied) (citing

12

*Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997)). To establish fraud by nondisclosure, the plaintiff must prove:

> (1) the defendant failed to disclose facts to the plaintiff, (2) the defendant had a duty to disclose those facts, (3) the facts were material, (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts, (5) the defendant was deliberately silent when it had a duty to speak, (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting, (7) the plaintiff relied on the defendant's nondisclosure, and (8) the plaintiff was injured as a result of acting without that knowledge.

*Id.*; *Horizon Shipbuilding, Inc. v. Blyn II Holding, LLC*, 324 S.W.3d 840, 850 (Tex. App.—Houston [14th Dist.] 2010, no pet.). A duty to disclose may arise (1) when there is a confidential or fiduciary relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure that conveys a false impression. *Guevara v. Lackner*, 447 S.W.3d 566, 578 (Tex. App.—Corpus Christi–Edinburg 2014, no pet.).

The Firm alleges that the Harper parties made three misrepresentations during the course of post-judgment discovery that form the basis of their fraud claims. Specifically, the Firm alleges that (1) Harper, in his May 2013 interrogatory answers, misrepresented that he owned only one bank account, which had a balance of less than a dollar, when he also owned a bank account that contained more than $12,000;

13

(2) Harper, in his May 2013 interrogatories, told the Firm that he had earned no income in 2012 and 2013 when he had received royalty income in 2012 and, later on his 2013 tax returns, he reported nearly $800,000 in income from his sole proprietorship but did not supplement his interrogatory responses to inform the Firm of this; and (3) Vicki, in her March 2015 deposition, testified that Harper rarely worked, made no money, and was not affiliated with ZO Energy, when both parties testified in later depositions that Harper was the sole officer and director of ZO Energy and that he performed work for ZO Energy and other companies.

### a.    Material misrepresentations

As summary judgment evidence, the Firm attached Harper's answers to interrogatories, dated May 24, 2013, and produced in response to the Firm's post-judgment discovery requests. Interrogatory Number One asked Harper to "[i]dentify all current bank accounts you own, in whole or in part, and all bank accounts you have owned, in whole or in part, within the previous two (2) years." Harper responded that he owned an account with Broadway Bank and that the balance as of May 17, 2013, was $0.73.

The Firm presented summary judgment evidence that, in addition to his bank account with Broadway Bank, Harper also had an account with USAA that, as of September 30, 2013, contained "Cash/money market funds" and "Small cap stocks/funds," for a "total portfolio value" of $12,117.52. The bank statements

14

included a graph depicting "Portfolio performance," which indicated that the account had been opened in late 2011. The Firm also attached a bank statement for the period of April 1 through June 30, 2014. This statement reflected that, during the statement period, $8,079.39 was withdrawn from the account, leaving an account balance of $0.15 on June 30, 2014. Harper did not disclose the existence of this account until after discovery began in the underlying lawsuit leading to this summary judgment proceeding.[3]

The Firm thus presented some evidence that Harper, in answering Interrogatory Number One, misrepresented the bank accounts that he owned.[4]

The Firm also presented affidavit testimony from Bonnie Spencer, the Firm's principal, who averred that the Firm had been continuously attempting to collect on

---

[3] The Harper parties argued that this account was disclosed to the Firm during discovery. As the Firm points out, the Bates stamp for the bank statements reflect that they were produced on November 3, 2017, more than three years after the majority of the funds were withdrawn from the account.

[4] The Harper parties argue that the Firm "fails to disclose that these funds [in the USAA bank account] belonged to ZO Energy (a non-debtor)" and cite to testimony from Harper's 2018 deposition, in which he testified that ZO Energy "paid for" the account but the account could not be styled in the name of a company account. The USAA bank account statements are addressed to "Steve J Harper and Vicki D Harper Com Prop" and list both Harper and Vicki, along with their "[m]ember numbers." This conflicting evidence raises a fact issue concerning the ownership of the USAA account. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)) (stating that genuine issue of material fact exists if evidence rises to level that enables reasonable and fair-minded people to differ in their conclusions).

15

the judgment it had against Harper since 1999, and, to this end, it sent post-judgment discovery requests to Harper to discover whether he had any nonexempt assets. Spencer averred that the Firm relied upon Harper's interrogatory answers that he had only the bank account with Broadway Bank and remained unaware of the USAA account for several years, ultimately losing the opportunity to attach the nonexempt assets contained in that account in satisfaction of the judgment.

Given the nature of these proceedings, in which the Firm was attempting to discover whether Harper had any nonexempt assets that could be attached to satisfy the Firm's outstanding judgment against him, misrepresentations concerning whether Harper had assets such as bank accounts are material. *See Italian Cowboy Partners*, 341 S.W.3d at 337 ("Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question.").

### b. Knowledge of falsity

The USAA bank account statements presented as summary judgment evidence lists both Harper's and Vicki's names as owners of the account, and the statements also include both of their names and their separate "[m]ember numbers." The statements also include a graph depicting past portfolio performance that reflects that this account had been active since late 2011. The Firm also presented as summary judgment evidence a form sent in conjunction with the 2013 tax year from

16

USAA Federal Savings Bank entitled "Proceeds from Broker and Barter Exchange Transactions" with an account number that matched the Harpers' account number.[5] Harper, however, did not disclose the existence of this account when he answered the May 2013 interrogatories, and instead only identified his account with Broadway Bank.

We conclude that the Firm raised a fact issue on whether, at the time Harper answered the interrogatories, he made the statement regarding the bank accounts that he owned with knowledge of the statement's falsity or made the statement recklessly without knowledge of the truth of this statement. *See id.* (stating that, as element of common-law fraud, plaintiff must establish that, when statement was made, defendant knew it was false or made it recklessly without knowledge of truth).

### c. Intent for plaintiff to rely and actual reliance on statement

The Firm also attached as summary judgment evidence the transcript of Harper's deposition taken in February 2018. In this deposition, Harper testified that he understood that, when answering interrogatories, he swears to tell the truth. He also testified that he understood that when a money judgment is rendered against someone and that person does not appeal the judgment, that person owes money to the judgment creditor. He further testified that he understood that a judgment

---

[5]   Several digits of the account number on this form were redacted, but the final four digits of the account number matches the account number listed on the Harpers' USAA bank statements.

17

creditor, in attempting to collect its judgment, can use post-judgment discovery to identify assets of the judgment debtor that could be used to satisfy the judgment if the debtor does not voluntarily pay the judgment. Harper later testified that he "did a lot of work for" ZO Energy "for nothing" because he "was doing other things" and did "not need the money." When asked how he could not need the money given that the Firm had a judgment against him in excess of $30,000, Harper testified, "I didn't need to pay [the Firm]." He later testified that he had complaints about the Firm's representation of him, although he acknowledged that he did not raise these issues during the Firm's initial suit to recover its unpaid fees, and he stated that he could not take money out of ZO Energy to pay the judgment against him because "[m]y wife wouldn't pay you a penny. I can tell you that."

Vicki, in her February 2018 deposition, likewise testified that she understood that, when answering interrogatories or other discovery requests, she has an obligation to be truthful, that the requesting party will rely upon her answers to interrogatories, and that she expects the requesting party to rely upon her answers. Vicki testified that she was aware the Firm had a judgment against Harper, but they did not "have any money to pay it with." When told that the Firm could use certain legal means to take money to satisfy the judgment if Harper did not pay it voluntarily, Vicki responded, "Well, good luck" and "Keep looking."

The Firm presented summary judgment evidence that, for nearly two decades, Harper had resisted satisfying the judgment that it had obtained against him and that he would continue to resist satisfying the judgment in the future. The Firm also presented summary judgment evidence that Harper understood the purpose of post-judgment discovery as it related to the Firm's attempts to collect on its judgment and that he knew the Firm would rely on his discovery responses in attempting to find nonexempt assets that could be used to satisfy the judgment. From this evidence, it is reasonable to infer that the Harper parties, through their discovery responses, including the misrepresentation contained in Harper's answer to Interrogatory Number One, made the representation that Harper had only one bank account with a balance of less than $1.00 with the intent that the Firm would rely upon the representation and not seek out additional bank accounts, such as the USAA bank account, to satisfy the judgment. We conclude that the Firm has raised a fact issue on whether the Harper parties made the misrepresentation concerning the USAA bank account with the intent to induce the Firm's reliance on the representation. *See Emerald Oil & Gas*, 348 S.W.3d at 217 (listing elements of common-law fraud).

The Firm also presented summary judgment evidence, in the form of Bonnie Spencer's affidavit, that it actually relied on the Harper parties' misrepresentation. Spencer averred that the Firm relied upon Harper's sworn interrogatory answers and "remained unaware of the assets," the existence and location of which "were

19

virtually unknowable." Spencer averred that the Harpers' misleading statements "increased the time and effort the Law Firm's attorneys have had to spend to locate nonexempt assets of Stephen Harper" and that the Firm "lost the opportunity to attach nonexempt assets owned by Stephen Harper including, but not limited to, the cash and stock in the USAA bank account."

We conclude that the Firm has raised a fact issue on the question of whether it acted in reliance on the Harper parties' misrepresentation. *See id.*

### d. Injury

Texas recognizes two measures of direct damages for claims of common-law fraud: out-of-pocket damages and benefit-of-the-bargain damages. *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018); *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015). Out-of-pocket damages derive from a restitutionary theory and are measured by the difference between the value expended versus the value received, whereas benefit-of-the-bargain damages derive from an expectancy theory and a measured by the difference between the value as represented and the value received. *Anderson*, 550 S.W.3d at 614.

The Firm presented summary judgment evidence that Harper, at the time he answered the interrogatories in May 2013, had a bank account with USAA that he did not disclose to the Firm. As of September 30, 2013, that account, which

contained "Cash/money market funds" and "Small cap stocks/funds,"[6] had a portfolio value of $12,117.52. As of June 30, 2014, less than one year later, the majority of the funds had been withdrawn from the account, leaving a balance of $0.15. The Firm did not learn of the account until years later, when Harper disclosed the existence of the account in response to discovery in the underlying lawsuit.

Bonnie Spencer averred that, in conducting post-judgment discovery in an attempt to collect upon the judgment the Firm had against Spencer, the Firm relied on Harper's discovery responses, including his interrogatory answer that he had only one bank account with Broadway Bank. She averred that the Firm "remained unaware of the assets," including the USAA bank account, and the existence of this account was "virtually unknowable." She further averred that the Harpers' misrepresentations damaged the Firm by "increase[ing] the time and effort the Law Firm's attorneys have had to spend to locate nonexempt assets of Stephen Harper," and, due to the misrepresentations, the Firm "lost the opportunity to attach nonexempt assets owned by Stephen Harper including, but not limited to, the cash and stock in the USAA bank account." Spencer averred that had Harper disclosed the existence of the account, which contained nonexempt assets subject to execution

---

[6]     Neither "Cash/money market funds" nor "Small cap stocks/funds" falls within the Texas Property Code's definition of personal property that is exempt from garnishment, attachment, execution, or other seizure. *See* TEX. PROP. CODE ANN. §§ 42.001–.002.

by the Firm, the Firm "could and would have obtained at least some satisfaction of its judgment" and the Firm "could and would have taken the necessary steps to discover and attach Stephen Harper's nonexempt assets to credit toward this judgment." Spencer averred that the hours worked by the Firm's attorneys to collect on the judgment were worth $166,194.18 and were expended from June 1, 2013, to December 20, 2017, when a receiver was appointed to aid in collecting the judgment.

The Firm has presented some evidence raising a fact issue that it was injured as a result of relying upon the Harper parties' misrepresentation. Specifically, because the Firm was unaware that Harper had a bank account with USAA until several years after the majority of the funds were withdrawn from this account, the Firm was unable to attach the assets in this account to satisfy its judgment against Harper. As a result, the Firm, as of the time it filed its summary judgment response, still had not been able to satisfy its judgment, either in whole or in part. Additionally, the Firm presented some evidence that, due to its reliance upon the Harper parties' misrepresentations, it expended over $166,000 worth of attorney's time in ultimately unsuccessful attempts to collect on the judgment.

We conclude that the Firm has raised a fact issue on whether it suffered an injury as a result of the Harper parties' misrepresentations.[7] *See Emerald Oil & Gas*,

---

[7] The Harper parties cite the Texas Supreme Court's decision in *In re Nalle Plastics Family Ltd. Partnership* for the proposition that, while attorney's fees may be compensatory in that they help make a claimant whole, they are not damages. *See*

348 S.W.3d at 217 (stating that fraud plaintiff must establish that it suffered injury by actively and justifiably relying on defendant's misrepresentation). We therefore hold that the Firm raised a fact issue on each essential element of its claim for common-law fraud, and therefore the trial court erred in granting summary judgment in favor of the Harper parties on this claim.

### e. Additional elements relevant to fraud by nondisclosure

In addition to its claim for common-law fraud, the Firm also asserted a claim for fraud by nondisclosure, a "subcategory" of fraud. In discussing the Firm's common-law fraud claim, we have already addressed several of the essential elements of its claim for fraud by nondisclosure, including whether the Harper parties failed to disclose facts to the Firm; whether the facts were material; whether

---

406 S.W.3d 168, 172–74 (Tex. 2013) (orig. proceeding). In that case, the Texas Supreme Court addressed whether attorney's fees could be included in the amount of compensatory damages awarded in a judgment for the purposes of determining the amount of security that needed to be posted for appeal. *See id.* at 169. After concluding attorney's fees were not included in the definition of compensatory damages for this purpose, the court then stated, "[W]e reject the idea that attorney's fees can *never* be considered compensatory damages." *Id.* at 174. The court noted that in the underlying breach-of-contract claim in that case, the allegations included failure to pay attorney's fees for prior representation. *Id.* at 174–75. The court stated, "While attorney's fees incurred in prosecuting this claim are not compensatory damages, the fees comprising the breach-of-contract damages are. If the *underlying* suit concerns a claim for attorney's fees as an element of damages . . . then those fees may properly be included in a judge or jury's compensatory damages award." *Id.* at 175. Here, the Firm argues that it seeks attorney's fees that it expended in collecting the judgment as a result of the Harper parties' misrepresentations; it does not seek the attorney's fees that it has expended in prosecuting its fraud claim against the Harper parties.

the Harper parties, by failing to disclose the facts, intended to induce the Firm to take some action or refrain from taking action; whether the Firm relied upon that nondisclosure; and whether the Firm was injured as a result of acting without that knowledge. *See Blankinship*, 399 S.W.3d at 308; *Horizon Shipbuilding, Inc.*, 324 S.W.3d at 850. We now address whether the Firm has raised a fact issue on each of the remaining elements of its fraud-by-nondisclosure claim.

With respect to whether the Harper parties had a duty to disclose the fact that Harper also had a bank account with USAA that contained nonexempt assets, we note that Rule of Civil Procedure 193.1 requires a party responding to written discovery to "make a complete response, based on all information reasonably available to the responding party or its attorney at the time the response is made." TEX. R. CIV. P. 193.1. A party also has a continuing duty, under the Rules of Civil Procedure, to amend or supplement its discovery responses if the party "learns that the party's response to written discovery was incomplete or incorrect when made, or, although complete and correct when made, is no longer complete and correct." TEX. R. CIV. P. 193.5(a). An amended or supplemental response "must be made reasonably promptly after the party discovers the necessity for such a response." TEX. R. CIV. P. 193.5(b). Thus, the Harper parties, as parties responding to the Firm's post-judgment interrogatories, had a duty to provide a complete response, as well as

24

a duty to amend or supplement that response if the information initially provided was incorrect, incomplete, or later became incorrect or incomplete.

A duty to disclose may also arise in the following situations: when a party voluntarily discloses information, the whole truth must be disclosed; when a party makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and when a party makes a partial disclosure and conveys a false impression. *See Guevara*, 447 S.W.3d at 578. The Firm presented evidence that Harper, in response to an interrogatory requesting that he identify "all current bank accounts you own, in whole or in part, and all bank accounts you have owned, in whole or in part, within the previous two (2) years," disclosed that he had a bank account with Broadway Bank, but he did not disclose that he also had a bank account with USAA bank. The Firm presented evidence that Harper did not disclose "the whole truth" concerning bank accounts that he owned and that his disclosure that he only owned a bank account with Broadway Bank conveyed a false representation. *See id.* We conclude that the Firm has raised a fact issue on whether the Harper parties had a duty to disclose information concerning the USAA bank account.

With respect to whether the Harper parties knew that the Firm was ignorant of the facts and did not have an equal opportunity to discover the facts, both Harper and Vicki testified in their depositions that they understood the purpose of

interrogatories in post-judgment discovery and that they knew the Firm would rely upon their answers to post-judgment discovery requests. Harper, in particular, testified that he knew that a judgment creditor could use post-judgment discovery tools to seek information concerning nonexempt assets of the judgment debtor. The Firm presented evidence that this is, in fact, what it did. Bonnie Spencer averred that Harper did not voluntarily pay the judgment that the Firm had against him, and after the judgment remained unsatisfied for years, the Firm propounded post-judgment discovery requests to the Harper parties in an attempt to identify any nonexempt assets of Harper that could be executed upon to satisfy the judgment. Information such as bank accounts owned by Harper are necessarily within his knowledge, and not that of the Firm.

We conclude that the Firm raised a fact issue on the question of whether the Harper parties knew that the Firm was ignorant of Harper's USAA bank account and did not have an equal opportunity to discover that fact. *See Blankinship*, 399 S.W.3d at 308 (listing elements of fraud by nondisclosure).

Finally, with respect to the question of whether the Harper parties were deliberately silent when they had a duty to speak, the Firm presented summary judgment evidence that Harper did not disclose the existence of the USAA bank account, which had over $12,000 in nonexempt assets in it at the time he answered the May 2013 interrogatories, one of which specifically requested that he identify all

of his current bank accounts as well as bank accounts that he had owned within the previous two years. Instead, the existence of that account was not disclosed until the pendency of the underlying litigation, by which point nearly all of the funds in the account had long been withdrawn and thus were unable to be executed upon to satisfy the Firm's judgment.

The Firm also presented summary judgment evidence from which it can be inferred that Harper has no intention of paying the Firm's judgment against him. Considering this evidence together, we conclude that the Firm has raised a fact issue of whether the Harper parties were deliberately silent concerning the USAA bank account when they had a duty to speak and disclose the existence of the account. *See id.*

We hold that the Firm has raised a fact issue on each essential element of its claim for fraud by nondisclosure and, therefore, the trial court erred by granting summary judgment in favor of the Harper parties on this claim.

### 2. *The Firm's Conspiracy to Commit Fraud Claim*

To prevail on a claim for civil conspiracy, the plaintiff must establish: (1) a combination of two or more persons; (2) an object to be accomplished (either an unlawful purpose or a lawful purpose by unlawful means); (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667,

675 (Tex. 1998); *see Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 583 (Tex. 2001); *Cohen v. Arthur Andersen, L.L.P.*, 106 S.W.3d 304, 307 (Tex. App.—Houston [1st Dist.] 2003, no pet.). An actionable conspiracy must consist of acts which would have been actionable against the conspirators individually. *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos.*, 217 S.W.3d 653, 668 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). "Conspiracy is a derivative tort because 'a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.'" *W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC*, 437 S.W.3d 917, 920 (Tex. App.—Dallas 2014, pet. denied) (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)). There "can be no independent liability for civil conspiracy," so if the trial court correctly grants summary judgment against the claimant on the underlying tort, the claimant does not have a viable conspiracy claim. *Id.*

The Firm presented summary judgment evidence that Harper had not paid the judgment rendered against him and that he did not ever intend to pay the judgment. The Firm also presented evidence that Vicki "wouldn't pay [the Firm] a penny" to satisfy the judgment against Harper. The Firm also presented summary judgment evidence that although Harper performed work for ZO Energy—including serving as its director and president, assisting in putting together drilling prospects, and acting as a landman—Harper has never received a paycheck from ZO Energy.

28

Instead, he and Vicki used ZO Energy's bank account to pay their household and personal expenses, and the Firm presented summary judgment evidence that ZO Energy paid over $200,000 in bills and expenses for Harper. Harper testified at his deposition that ZO Energy's payment of his bills is "how they pay [him]." Vicki testified at her deposition that they try to "keep as much money in the company [ZO Energy] as we possibly can, we pay our bills, the ones that are urgent and need to be paid. That is how we operate that entity." When asked why the Harpers do not take draws from the company, put that money into their own personal bank accounts, and use their own accounts to pay their bills, Vicki responded, "We prefer not to do it that way" and "We don't want to."

As we have already discussed with respect to the Firm's fraud claims, the Firm also presented summary judgment evidence sufficient to raise a fact issue that Harper, during the course of the Firm's post-judgment discovery seeking to learn of any nonexempt assets that Harper possessed in order to satisfy the judgment it had against him, materially misrepresented his financial condition, preventing the Firm from executing on his nonexempt assets to the Firm's detriment.

Viewing all of the Firm's summary judgment evidence in the light most favorable to the Firm, as we are required to do, we conclude that the Firm has presented some evidence raising a fact issue that Harper, Vicki, and ZO Energy all combined and agreed with the object of thwarting the Firm's attempts to collect its

29

judgment against Harper by misrepresenting Harper's financial condition to the Firm and by structuring their finances such that assets remained with ZO Energy, instead of being distributed to Harper, and thus beyond the Firm's ability to attach the assets to satisfy its judgment. *See Ernst & Young*, 51 S.W.3d at 583 (stating elements of civil conspiracy); *see also Helix Energy Sols. Grp.*, 522 S.W.3d at 431 (stating that we indulge every reasonable inference and resolve any doubts in favor of nonmovant). We hold that the trial court erred by granting summary judgment in favor of the Harper parties on the Firm's claim for conspiracy to commit fraud.

### 3. *The Firm's TUFTA Claim*

TUFTA is found in Texas Business and Commerce Code Chapter 24. TUFTA is "designed to protect creditors from being defrauded or left without recourse due to the actions of unscrupulous debtors," and the purpose of the statute is to "prevent debtors from defrauding creditors by placing assets beyond their reach." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 89 (Tex. 2015) (quoting *Corpus v. Arriaga*, 294 S.W.3d 629, 634 (Tex. App.—Houston [1st Dist.] 2009, no pet.)); *Sargeant v. Al Saleh*, 512 S.W.3d 399, 412 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.) ("TUFTA provides a comprehensive statutory scheme through which a creditor may seek recourse for a fraudulent transfer of assets or property.").

Business and Commerce Code section 24.005, addressing "Transfers Fraudulent as to Present and Future Creditors," provides:

(a)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

   (1)  with actual intent to hinder, delay, or defraud any creditor of the debtor; or

   (2)  without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

      (A)  was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

      (B)  intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TEX. BUS. & COM. CODE ANN. § 24.005(a).

Section 24.005(b) sets out a non-exclusive list of factors to consider when determining whether the debtor acted with actual intent to hinder, delay, or defraud the creditor. *Id.* § 24.005(b); *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 203 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). These "badges of fraud" include whether:

(1)  the transfer or obligation was to an insider;

(2)  the debtor retained possession or control of the property transferred after the transfer;

(3)  the transfer or obligation was concealed;

(4)  before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)     the transfer was of substantially all the debtor's assets;

(6)     the debtor absconded;

(7)     the debtor removed or concealed assets;

(8)     the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)     the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)   the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)   the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS. & COM. CODE ANN. § 24.005(b); *see id.* §§ 24.002(7) (defining "insider" to include, for individual debtor, relative of debtor and corporation of which debtor is director, officer, or person in control), 24.002(11) (defining "relative" to include spouse of debtor). Actual intent to defraud creditors is ordinarily a fact question, and circumstantial evidence may be used to prove fraudulent intent because direct proof is often unavailable. *Qui Phuoc Ho v. MacArthur Ranch, LLC*, 395 S.W.3d 325, 328 (Tex. App.—Dallas 2013, no pet.); *Hahn v. Love*, 321 S.W.3d 517, 525 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The presence of several badges of fraud is sufficient to support a reasonable inference of fraudulent intent. *MacArthur Ranch*, 395 S.W.3d at 328.

Business and Commerce Code section 24.006, addressing "Transfers Fraudulent as to Present Creditors," provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

TEX. BUS. & COM. CODE ANN. § 24.006(a). A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation. *Id.* § 24.003(a); *Nat'l Loan Inv'rs, L.P. v. Robinson*, 98 S.W.3d 781, 784 (Tex. App.— Amarillo 2003, pet. denied) (stating that insolvency must be evaluated from creditor's perspective). "Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under [TUFTA]." TEX. BUS. & COM. CODE ANN. § 24.003(d).

TUFTA defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." *Id.* § 24.002(12). TUFTA defines "asset" as "property of a debtor," and provides that "asset" does not include, among other things, property encumbered by a valid lien or property that is generally exempt under non-bankruptcy law. *Id.* § 24.002(2); *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 341 (Tex. 2009) ("Without an asset, no fraudulent transfer can occur under [TUFTA]."). "Property" is defined as "anything that may be the subject

33

of ownership." TEX. BUS. & COM. CODE ANN. § 24.002(10); *see Van Slyke v. Teel Holdings, LLC*, No. 01-08-00600-CV, 2010 WL 2788876, at *5 (Tex. App.— Houston [1st Dist.] July 15, 2010, no pet.) (providing that payment of cash constituted transfer under TUFTA because statutory definition of "transfer" included "payment[s] of money").

TUFTA section 24.004 provides that value is given for a transfer if, in exchange for the transfer, "property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person." TEX. BUS. & COM. CODE ANN. § 24.004(a). "Reasonably equivalent value" includes "a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." *Id.* § 24.004(d). "Value" and "reasonably equivalent value" are both determined as of the time of the transaction, not in hindsight. *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 569 (Tex. 2016). "Assuming consideration of value is exchanged in the first instance, '[t]he concept of reasonably equivalent value is a means of determining if the debtor received a fair exchange in the market place for the [asset] transferred.'" *Id.* at 569–70 (quoting *In re Ozark Rest. Equip. Co.*, 850 F.2d 342, 344–45 (8th Cir. 1988)).

In *Janvey*, the Texas Supreme Court addressed the definition of "reasonably equivalent value" and held:

> While the definitions of "value" and "reasonably equivalent value" are expansive and nonexclusive, there is nevertheless an implicit requirement that the transfer confer some direct or indirect economic benefit to the debtor, as opposed to benefits conferred solely on a third-party, transfers that are purely gratuitous, and transactions that merely hold subjective value to the debtor or transferee. This is so because value must "be determined in light of the purpose of [TUFTA] to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors." Accordingly, love and affection, and other types of consideration that have "no utility from a creditor's viewpoint" do not confer value for an exchange. Rather, consideration "must go beyond some speculative, ephemeral[,] psychic satisfaction" to constitute "value" or "reasonably equivalent value."

> Importantly, however, the "requirement of economic benefit to the debtor does not demand consideration that replaces the transferred property with money or something else tangible or leviable that can be sold to satisfy the debtor's creditors' claims." This is especially so when a debtor purchases services or consumable goods. A construction of the term "value" that would automatically or effectively exclude consideration in the form of consumable goods or services—for example, food, utilities, internet or telephone services, office supplies, and employee compensation or benefits—is simply unsupportable under a plain reading of the statute.

> . . . . The purpose of fraudulent conveyance law "is not to protect the debtor's creditors from all transfers that have no realizable economic benefit. Indeed, . . . the law actually tolerates some transfers that diminish the value of their claims by reducing the amount of leviable, saleable assets, such as transfers in exchange for services." In fact, the definition of value expressly includes a transfer made to satisfy an antecedent debt, even though satisfaction of the debt would deplete estate assets that might otherwise have been available for the benefit of creditors.

*Id.* at 574–76 (internal citations omitted). The court further held, "Under a plain reading of TUFTA, value exists when the debtor took consideration that had objective value at the time of the transfer, even if the consideration neither preserved the debtor's estate nor generated an asset or benefit that could be levied to satisfy unsecured creditors." *Id.* at 577. "Whether a debtor obtained reasonably equivalent value in a particular transaction is determined from a reasonable creditor's perspective at the time of the exchange, without regard to the subjective needs or perspectives of the debtor or transferee and without the wisdom hindsight often brings." *Id.* at 582.

As we have discussed with respect to the Firm's conspiracy claim, the Firm presented summary judgment evidence that while Harper serves as president and director of ZO Energy, assists Vicki in putting together drilling prospect packages for ZO Energy, "do[es] the operational part" of the company, and occasionally acts as a landman for ZO Energy, ZO Energy does not pay Harper a salary. Instead, in lieu of a paycheck for Harper, ZO Energy either pays Harper's bills and expenses directly from its bank account, or it transfers funds to Vicki, who then pays the Harpers' bills from her own bank account. This is some evidence that Harper has transferred funds to ZO Energy and, ultimately, to Vicki by essentially assigning to them his right to income that he has earned for the work he performs for ZO Energy. *See* TEX. BUS. & COM. CODE ANN. § 24.002(12) (defining "transfer" to mean "every

mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset").

Vicki, as Harper's spouse, qualifies as an "insider" under TUFTA, as does ZO Energy, a corporation for which Harper, the debtor, serves as a director and officer. *See id.* §§ 24.002(7) (defining "insider" to include relative of individual debtor and corporation of which debtor is director or officer), (11) (defining "relative" to include debtor's spouse); *see also id.* § 24.005(b)(1) (listing whether transfer was made to insider as badge of fraud). Harper and Vicki both testified during their depositions that Harper is a signatory on ZO Energy's bank account, that Harper is authorized to draw from the money that ZO Energy has in its bank account and use those funds to pay his personal bills and expenses, and that Harper does this with Vicki's knowledge. The Firm thus presented evidence that Harper retains control over ZO Energy's assets, including any income owed to him that remains in ZO Energy's bank account. *See id.* § 24.005(b)(2) (listing whether debtor retained possession or control over property after transfer as badge of fraud).

The Firm obtained its judgment against Harper in 1999, and it propounded post-judgment discovery requests to Harper in 2013. Vicki, when testifying concerning the Harpers' practice of keeping money in ZO Energy's bank account and paying bills out of that account, stated, "That is how we operate that entity," indicating that this is a current practice for the Harper parties and thus occurred after

37

the Firm obtained a judgment against Harper and while the Firm was actively seeking to collect on that unsatisfied judgment. *See id.* § 24.005(b)(4) (listing whether debtor had been sued or threatened with suit before transfer was made as badge of fraud).

Both Harper and Vicki repeatedly testified in their depositions that Harper did not have any assets, stating that they relied upon the funds in ZO Energy's bank account and loans from friends to pay their bills and expenses. When Harper answered the Firm's interrogatories in May 2013, he identified as his sole bank account an account with Broadway Bank that had a balance of less than $1.00. Harper also testified that he has never received a paycheck from ZO Energy and, instead, the company compensates him for the services he performs by paying his bills and expenses directly from its own bank account. The Firm thus presented some evidence that Harper transferred substantially all of his assets to ZO Energy and that, at the time of the transfers, he was insolvent. *See id.* § 24.005(b)(5), (9) (listing, as badges of fraud, whether transfer was substantially all of debtor's assets and whether debtor was insolvent at time of transfer); *see also id.* § 24.003(a) (providing that debtor is insolvent if "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation").

Based on the summary judgment evidence presented, including evidence relevant to several of the badges of fraud identified in TUFTA, we conclude that the

38

Firm has presented sufficient evidence to raise a fact issue that Harper transferred his income to ZO Energy with the actual intent to hinder, delay, or defraud the Firm, a preexisting creditor of Harper. We hold that the trial court erred in granting summary judgment in favor of the Harper parties on the Firm's TUFTA claim.

## Conclusion

We reverse trial court's order granting summary judgment and remand the case for further proceedings.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Landau.